AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

JERMAINE WRIGHT,

Defendant.

ED17-0498M

FILED
CLERK, U.S. DISTRICT COURT

NOV 0 6 2017

CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the following date(s) in the County of San Bernardino in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| **COUNT ONE** (10/6/17)<br>18 U.S.C. § 666(a)(1)(B) | Bribery of programs receiving federal funds |
| **COUNT TWO** (8/3/17 — 10/6/17)<br>18 U.S.C. § 844(i) | Attempted arson of a building affecting interstate commerce |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/S/

*Complainant's signature*

KEVIN M. BOLES, Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11 / 6 / 17

KENLY KIYA KATO

*Judge's signature*

City and state: Riverside, California

Hon. KENLY KIYA KATO, U.S. Magistrate Judge

*Printed name and title*

AUSAs: Sean D. Peterson & Joseph B. Widman

## AFFIDAVIT

I, Kevin M. Boles, being duly sworn, declare and state as
follows:

### I.  PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of an application
for a criminal complaint charging Jermaine WRIGHT with
violations of Title 18, United States Code, Sections 844(i)
(attempted arson of a building affecting interstate commerce)
and 666(a)(1)(B) (bribery of programs receiving federal funds).

2.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested criminal
complaint and does not purport to set forth all of my knowledge
of or investigation into this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only.

### II. TRAINING AND EXPERIENCE OF THE AFFIANT

3.   I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI"), and have been so employed since November
2005.  I received extensive training at the FBI Academy in
Quantico, Virginia.  I am currently assigned to the Los Angeles
Division, Riverside Resident Agency, in Riverside, California
where my duties include the investigation of public corruption.
As a SA with the FBI, I have conducted numerous investigations
involving matters of national security, violent crimes,

fugitives, crimes against children, fraud, and public
corruption. During the course of my investigations, I have
coordinated undercover operations, interviewed witnesses,
conducted physical surveillance, participated in the execution
of arrest and search warrants, and reviewed various forms of
evidence including telephone call detail records, bank records,
invoices, and other miscellaneous forms. Through my training,
education, and experience, I have become familiar with a variety
of schemes involving the bribery of public officials in return
for official acts.

### III. SUMMARY OF PROBABLE CAUSE

4.    This criminal complaint stems from a public corruption
investigation involving the City of Adelanto, California.
Earlier this year, the FBI received information that Mayor Pro
Tem Jermaine WRIGHT ("WRIGHT") may have received bribe payments
in return for official acts. The official acts allegedly
concerned rezoning of land for use in the developing medical
marijuana industry in Adelanto. The FBI has used an FBI
undercover Special Agent ("UC-1") and a Cooperating Human Source
("CHS") in this part of the investigation. WRIGHT has solicited
and accepted a $10,000 bribe in exchange for his promise to
assist a supposed marijuana transportation business with
rezoning and code enforcement matters.

5.    During the investigation, WRIGHT solicited assistance
from the CHS in committing arson on WRIGHT's business, a
restaurant called Fat Boyz Grill, located in Adelanto. WRIGHT
solicited a second FBI undercover Special Agent ("UC-2") to

2

assist WRIGHT in burning down his restaurant, to collect
$300,000 in insurance proceeds.  WRIGHT paid UC-2 $1,500,
provided UC-2 a tour of the restaurant, and assisted in the
planning of the arson by providing a ladder for UC-2 and
discussing various tactics for maximizing the damage with UC-2.

### IV. DETAILED STATEMENT OF PROBABLE CAUSE

### A.   RECEIPT OF FEDERAL FUNDS BY CITY OF ADELANTO

6.   According to the City of Adelanto Fiscal Year 2016–
2017 Budget, publicly available on the City of Adelanto's
website, Adelanto has received $14,850 in "Federal Grants" and
$41,958 in a "Community Development Block Grant," which are
federal funds from the United States Department of Housing and
Urban Development, during fiscal year 2016-2017.

### B.   SCHEME TO REZONE LAND FOR CULTIVATION OF MARIJUANA

1.   June 15, 2017 Meeting Between UC-1 and WRIGHT

7.   Beginning in June 2017, this investigation used UC-1
to obtain further information surrounding allegations of
corruption in Adelanto.

8.   On June 15, 2017, the CHS[1] introduced UC-1 to WRIGHT at
Fat Boyz Grill.  Based upon my post-meeting conversations with

_____

[1]   The CHS has criminal convictions for receipt of stolen
property (1995, a felony), stalking (1995, a felony),
obstruction (1997, a misdemeanor), fighting/use of offensive
words (2002, a misdemeanor), and possession of controlled
substance paraphernalia (2010, misdemeanor).  The CHS appears to
be cooperating as a civic duty; the CHS has requested nothing in
return for the CHS's cooperation in this investigation.  The CHS
has not been paid for services, but has received a total of
$47.33 value in meals during two CHS debriefs and one
operational meeting.  The FBI has been able to corroborate most
of the information the CHS has provided through independent

3

UC-1 and CHS,[2] the following subparagraphs summarize portions of the meeting:

a.    UC-1 told WRIGHT that UC-1 was interested in moving UC-1's marijuana cultivation business to Adelanto and UC-1 inquired about the best way to get the permits, licenses, and other approvals necessary to do so.  Specifically, UC-1 told WRIGHT he was interested in purchasing a commercial property outside of the approved zone for marijuana cultivation at a reduced price and then attempt to have the land re-zoned by the City Council to increase the value of the property.

b.    WRIGHT told UC-1 that, to obtain the necessary votes from the Adelanto City Council for the expansion the area zoned for marijuana cultivation, UC-1 would have to purchase WRIGHT's vote.  During the conversation, WRIGHT asked UC-1 and the CHS, "are you asking me what my price is?"  WRIGHT told UC-1 and the CHS that WRIGHT's vote was "20."  UC-1 reported this to mean $20,000 to buy WRIGHT's vote.

c.    UC-1 inquired with WRIGHT about how to pay him.  WRIGHT told UC-1 that WRIGHT only accepts cash, and that cash must be "donat[ed]" through Person A, an individual WRIGHT identified.  WRIGHT placed one cell phone call to Person A from WRIGHT's cell phone requesting Person A's presence at Fat Boyz Grill, but Person A was not able to make it at the time.  UC-1 told WRIGHT that he felt more comfortable dealing with WRIGHT

---

investigation and consensual recordings, and, as such, has found the CHS to be credible.

[2] Although FBI attempted to record this meeting, that attempt was unsuccessful so this meeting was not recorded.

4

directly, but WRIGHT said the donation had to be made to Person A "because he keeps us out of jail."

       d.   WRIGHT also provided his cellular telephone number to UC-1 as 760-XXX-XX99 ("WRIGHT's Telephone Number") and identified the phone as a "burner" telephone through a company that does not track records, even if provided with a subpoena.

       2.   <u>Review of Records of WRIGHT's Telephone Number</u>

    9.   On March 13, 2017, I reviewed subscriber records from Verizon Wireless for WRIGHT's Telephone Number and determined that the account is, in fact, a prepaid cellular telephone sold by a mobile virtual network operator called TracFone Wireless Inc., which uses the Verizon Wireless network to provide service for the cellular telephone.

    10.   On or about July 5, 2017, I reviewed call detail records for WRIGHT's Telephone Number.

       a.   During this review, I learned that one out-going call to 760-XXX-XX57 ("Person A's Telephone Number") was connected during the timeframe of UC-1's meeting with WRIGHT on June 15, 2017 when WRIGHT placed the call to Person A.  On or about September 13, 2017, I reviewed subscriber information for Person A's Telephone Number and learned that the phone is subscribed to Person A.

       b.   During this review, I observed multiple communications between WRIGHT's Telephone Number and Person A's Telephone.

3.   June 20, 2017 Meeting Between UC-1 and WRIGHT

11.   On June 20, 2017, under my supervision and at my direction, UC-1 audio recorded a telephone call to WRIGHT to discuss the aforementioned June 15, 2017 meeting.  WRIGHT did not know he was being recorded.  Based upon my review of the recording and conversation with UC-1, I know that during the call, UC-1 verbally recalled that WRIGHT's vote "would be 20." WRIGHT did not refute this statement.  Later in the call, WRIGHT told UC-1 he would "always do what's best for the city."

12.   On July 1, 2017, the CHS told me the CHS spoke with WRIGHT on the telephone and WRIGHT complained about the aforementioned June 20, 2017 telephone call between UC-1 and WRIGHT.  Referencing UC-1 speaking about the $20,000 "donation," WRIGHT told the CHS he did not like to discuss business on the phone.

4.   City Council Activity Regarding Marijuana in Adelanto

13.   According to City of Adelanto public records, available on the city's website, on July 3, 2017, the City of Adelanto Planning Commission held a special meeting regarding resolution "P 17-33" recommending that the City Council adopt Ordinance Numbers 576 and 577, which proposed to expand the existing zone for the cultivation of marijuana in Adelanto.

14.   On July 14, 2017, the Adelanto City Council held a special meeting to vote on Ordinance Numbers 576 and 577.  This meeting was archived in video format on the City of Adelanto's website; I have reviewed the video.  WRIGHT was not physically

6

present, but attended and voted via telephone.  WRIGHT voted in
favor of the expansion of the marijuana zone.

        5.   July 26, 2017 Meeting Between UC-1 and WRIGHT

   15.  On July 26, 2017, under my supervision and at my
direction, UC-1 audio and video recorded an in-person
conversation with WRIGHT at Fat Boyz Grill.  WRIGHT did not know
he was being recorded.  Based upon my review of the recording
and conversation with UC-1, I believe the following
subparagraphs accurately summarize pertinent parts of this
conversation:

      a.   UC-1 confronted WRIGHT about the vote to re-zone
the land before UC-1 purchased a property and paid WRIGHT the
requested $20,000.  In the recorded conversation, UC-1 told
WRIGHT, "We had the first conversation, I think, fuck,
everything's good to go.  You know, uh, for the size of the
investment, you know, for 20, or possibly 10 for the other dude
. . ."

      b.   WRIGHT replied by saying, "and now it's nothing,
'cause it's already done."  WRIGHT later explained to UC-1 that
the vote took place on July 14 and WRIGHT voted by proxy via the
telephone.

      c.   UC-1 then asked WRIGHT to explain the best way to
quickly obtain a permit for marijuana cultivation provided UC-1
could obtain property in the newly expanded cultivation zone.
WRIGHT told UC-1, "Once you own the property, then get the, I
can get you your permit prior to your license."  UC-1 then said,
"OK, so, and again, just shooting straight, um, is that still a

donation of 20, or is that not near as much because it doesn't require a city vote?  Or is it still 20 anyways?"  WRIGHT initially responded with "whatever you say" but eventually WRIGHT told UC-1, "15."

d.    Towards the end of the conversation, WRIGHT explained that UC-1 should obtain a property address, fill out an application for cultivation on the City of Adelanto's website, and bring the paperwork to WRIGHT with a $7,000 check made out to the City of Adelanto.  WRIGHT then added, "Your donation . . . [unintelligible] . . . whatever you decide."

6.    Conclusion of this Scheme

16.   UC-1 never paid WRIGHT the initial $20,000 for WRIGHT's vote to rezone land to allow the cultivation of marijuana because the July 14, 2017 expansion vote occurred sooner than anticipated and the funds to pay the $20,000 were not available at the time.  UC-1 also did not pay WRIGHT the $15,000 for WRIGHT's services in speeding up the permit process for marijuana cultivation because it required the purchase of a property prior to paying the bribe.  I made the decision to avoid the financial liabilities of purchasing real property for the purpose of securing evidence of a $15,000 bribe payment.

C.    **BRIBE TO CURTAIL CODE ENFORCEMENT AND REZONE LAND FOR A MARIJUANA TRANSPORTATION BUSINESS**

1.    August 31, 2017 Conversation Between the CHS and WRIGHT

17.   On August 31, 2017, under my supervision and at my direction, the CHS audio-recorded an in-person conversation with WRIGHT at Fat Boyz Grill.  Based upon my review of the recording

and conversation with the CHS, I believe the following subparagraphs accurately summarize portions of the conversation:

a.    The CHS told WRIGHT about UC-1's desire to lease property owned by the CHS for the purpose of opening a marijuana transportation business.  WRIGHT advised the CHS the location of the property was not properly zoned for marijuana-related activity and would require an "exemption."  Specifically, WRIGHT told the CHS, "He [UC-1] would still have to have a distribution license, so he would need an exemption to be over there.  So if he wants his exemption, I want my ten."

b.    The CHS confirmed with WRIGHT that "ten" was referring to 10%.  The CHS then recommended to WRIGHT that he should ask for 20% of UC-1's annual profit so the money could be split 10% each, between WRIGHT and the CHS.  The CHS then asked WRIGHT, "how do we figure 20%?"  WRIGHT said, "You can't with something like that.  You have to come up with a straight up dollar amount."  The CHS reported this to mean WRIGHT was willing to take money in return for an "exemption" to allow UC-1 to operate a marijuana transportation business.

2.    September 26, 2017 Conversation Between the CHS and WRIGHT

18.    On September 26, 2017, under my supervision and at my direction, the CHS audio recorded an in-person conversation with WRIGHT at Fat Boyz Grill.  Based upon my review of the recording and conversation with the CHS, I believe the following subparagraphs accurately summarize portions of the conversation:

9

a.    During the conversation, the CHS and WRIGHT again
discussed UC-1's business proposal.  WRIGHT explained to the CHS
that the new state law requires marijuana distribution companies
to exist within a marijuana zone.  WRIGHT said, "all those that
apply for a transportation license have to be in the zone."
WRIGHT explained, "the only way I can see you doing it is that
he gets someone to use, lets someone use their address in the
zone, and he actually stores his vehicles outside the zone."
WRIGHT explained that he can speak with Person A because
Person A has an address within the zone.

b.    Later in the conversation, WRIGHT told the CHS,
"I'm gonna get you an address inside the zone."  The CHS asked,
"is that gonna cost?"  WRIGHT replied, "I will get the address
for free, but ain't shit in life is free, just do me right,
that's all I ask."

3.    Meeting on October 6, 2017 Between UC-1, the CHS,
and WRIGHT

19.    On October 6, 2017, under my supervision and at my
direction, the CHS and UC-1 audio and video recorded an in-
person meeting with WRIGHT in Adelanto.  Based upon my review of
the recording and conversation with the CHS, UC-1, and WRIGHT, I
believe the following subparagraphs accurately summarize
portions of the conversation:

a.    Early in the meeting, UC-1, the CHS, and WRIGHT
discussed various cell phone plans.  WRIGHT described his cell
phone plan and said, "if they subpoena my phone records, there's
no records because this is a burner."  I know from my training

10

and experience, the term "burner" is often used to describe pre-
paid cell phone plans.

   b.   During the meeting, a business proposal was
discussed in which UC-1 would lease property from the CHS for
the purpose of opening and operating a new marijuana
transportation business.   WRIGHT explained to UC-1 that the
transportation business could be opened at the location, so long
as marijuana was not stored at the location.

   c.   UC-1 then requested WRIGHT's assistance to
curtail code enforcement by presenting a hypothetical situation.
Specifically, UC-1 said, "so if, hypothetically, if there's some
shit in a van and code enforcement comes knocking on the door,
whatever, can I call you and be like, Yo Jermaine, like, get
these guys fucking off my back?"   WRIGHT responded, "Yeah, that
can be done."

   d.   UC-1 told WRIGHT the 20% figure WRIGHT had
discussed with the CHS in a previous conversation was too high.
UC-1 requested to reduce the annual payment to WRIGHT to 10%.
WRIGHT told UC-1 to work that out with the CHS, and then stated,
"being straight up is just being straight up, just cash me out
and call it a day."   WRIGHT continued, "if you gotta call me
because you got shit over there and I gotta get code enforcement
out of there, you know, once you hang up the cell, the phone, I
get them out of there, something's dropped off."   Based on the
context of the statement and in light of his later explanation
summarized in subparagraph h below, I understand this comment to

11

mean WRIGHT requires additional payment from UC-1 every time
WRIGHT curtails code enforcement on UC-1's behalf.

     e.    WRIGHT then explained the various zones and
distances relative to US highway 395. UC-1 requested WRIGHT's
future assistance to accommodate UC-1's business in future zone
expansions. UC-1 told WRIGHT, "I want to make sure that the
votes are going to include that building." WRIGHT responded,
"yes."

     f.    UC-1 then placed $10,000 dollars on a box being
used as a table, made up of two stacks of $50 bills, and told
WRIGHT, "that's for you, or your non-profit, whatever." WRIGHT
responded, "my non-profit, yes sir, thank you sir." WRIGHT
eventually placed the $10,000 in his pocket.

     g.    UC-1 then confirmed with WRIGHT that WRIGHT will
assist with code enforcement and votes and asked WRIGHT if he
wanted to count it. WRIGHT advised he had a counting machine
and did not need to count the money at the moment. UC-1 then
told WRIGHT, "I just don't want any confusion." WRIGHT said,
"no, you're good."

     h.    WRIGHT then explained to UC-1 he could curtail
code enforcement for UC-1, but WRIGHT would require a "stack"
for each incident when WRIGHT intercedes and curtails code
enforcement. WRIGHT and the CHS identified a "stack" as $2,000.
Referencing code enforcement operations, WRIGHT advised, "we
raid, once per month, based on who is fucking up." WRIGHT told
UC-1 the City of Adelanto will be making changes on the
following Wednesday to allow marijuana transportation businesses

to exist outside of the zone.  WRIGHT recommended that UC-1 use a separate address from where UC-1 will actually store the vehicles in order to get a license issued faster without waiting for an inspection and conditional use permit on the property leased by UC-1.

20.  On October 6, 2017, physical surveillance of WRIGHT was conducted by law enforcement.  Before the above-described October 6, 2017 meeting with UC-1 and the CHS, WRIGHT was at his restaurant, Fat Boyz Grill.  WRIGHT drove his Silver Chevrolet sedan from the restaurant to the meeting location.  At the conclusion of the meeting, WRIGHT left the meeting location with the $10,000 bribe payment and drove directly back to his restaurant without making any stops.  WRIGHT was seen walking back inside the restaurant by a surveillance unit.

### D.  ATTEMPTED ARSON OF FAT BOYZ GRILL

#### 1.  Background

21.  On August 3, 2017, the CHS reported that he had a conversation with WRIGHT in which WRIGHT requested, among other things, assistance finding someone who can help burn down WRIGHT's business, Fat Boyz Grill, in order to collect the insurance money.  This conversation was not recorded.

22.  On August 25, 2017, the CHS reported that he had a conversation with WRIGHT in which WRIGHT reaffirmed his desire to have the CHS find someone to burn down WRIGHT's business, Fat Boyz Grill.  WRIGHT told the CHS he requested the arson to appear as an accident caused by an electrical problem.  WRIGHT told the CHS he was willing to pay for the services after the

insurance money was collected.  This conversation was not recorded.

       2.   Potential Effect on Interstate Commerce

23.  In or about September 2017, I conducted the following investigation of WRIGHT's Fat Boyz Grill restaurant to determine the potential for the proposed arson at Fat Boyz Grill Restaurant to affect interstate commerce:

      a.   Fat Boyz Grill is located at 11619 Rancho Road, Suite 1, Adelanto, California, which is approximately one block west of US Highway 395.  US Highway 395 crosses several state lines extending from California, Nevada, Oregon, and Washington State.  Fat Boyz Grill is located close enough to US Highway 395 to serve patrons traveling interstate along the US Highway 395 corridor.  Fat Boyz Grill is also approximately six miles from Interstate 15.

24.  I reviewed records from Wells Fargo checking account number XXXXXX7711, in the names Jermaine WRIGHT Sr. and Amber Wright.  The transactions listed in the account statements indicate the account is jointly used for personal banking and business banking for Fat Boyz Grill.  For example, the statements and cancelled checks indicate payments to "Sysco," a restaurant supply company headquartered in Texas.  In addition, there are multiple daily electronic deposits from "WorldPay Bnkcrd" referencing Fat Boyz Grill.  Internet-based research of WorldPay indicated it is an international company traded on the London Stock Exchange with a U.S.-based headquarters in Atlanta, Georgia.  Worldpay provides the point of sale services for

14

businesses to allow customers to pay with various credit and
debit cards.

25. I reviewed Sysco Corporation invoices of items
purchased by WRIGHT for Fat Boyz Grill. Some of the items
purchased by WRIGHT were products manufactured by Coca-cola, a
company headquartered in Atlanta, Georgia, products from Hormel,
a company headquartered in Austin, Minnesota, and Tyson, a
company headquartered in Springdale, Arkansas. The headquarters
identified for these companies were determined through the
company's websites and other internet-based research.

26. During the execution of a federal search warrant on
October 17, 2017 at Fat Boyz Grill (described in more detail
below), several items were located with labels further
indicating an interstate nexus. Items observed and photographed
at Fat Boyz Grill include, but are not limited to, Rose sausage
patties labeled from Barrington, Illinois, Tyson Food products
labeled from Springdale, Arkansas, Domino Foods Inc. products
labeled from Yonkers, New York, and Folger's Coffee products
labeled from Orrville, Ohio. In addition to the food products,
a Delfield model N225 ice cream freezer was located inside Fat
Boyz Grill. The label on the freezer indicated Delfield is
located in Mt. Pleasant, Michigan.

3. September 26, 2017 Conversation Between CHS and
WRIGHT

27. On September 26, 2017, at my direction and under my
supervision, the CHS audio recorded an in-person conversation
with WRIGHT at Fat Boyz Grill. Based upon my review of the

recording and conversation with the CHS and WRIGHT, I believe
the following subparagraphs accurately summarize portions of the
conversation:

a.    WRIGHT gave permission for the CHS to pass
WRIGHT's cell phone to the "electrician." The CHS reported this
was WRIGHT's nickname for the prospective arsonist because
WRIGHT wanted the cause of the fire to appear to be an
electrical problem. WRIGHT told the CHS, "you have that
electrician call me."

b.    At the end of the conversation, WRIGHT reminded
the CHS again, "the other guy, go ahead and reach out." The CHS
reported WRIGHT was referencing the electrician.

28.    On September 28, 2017, UC-2 placed a recorded
telephone call to WRIGHT's Telephone Number. UC-2 did not
identify himself, but told WRIGHT that he (UC-2) heard WRIGHT
needed some work done at his restaurant. WRIGHT affirmed the
need for work and a meeting was set for October 3, 2017.

4.    October 3, 2017 Telephone Conversation and
        Meeting Between UC-2 and WRIGHT

29.    On October 3, 2017, at my direction and under my
supervision, UC-2 audio-recorded a telephone call with WRIGHT.
WRIGHT did not know he was being recorded. UC-2 called WRIGHT's
Telephone Number and asked WRIGHT to walk to UC-2's vehicle
parked outside Fat Boyz Grill. I conducted physical and video
surveillance of the meeting and saw WRIGHT walk from Fat Boyz
Grill to UC-2's vehicle.

30.  At my direction and under my supervision, on this date UC-2 audio and video recorded the in-person meeting with WRIGHT. Based upon my review of the recording and conversation with UC-2, I believe the following subparagraphs accurately summarize portions of the conversation:

a.  UC-2 asked WRIGHT what he was looking at time-wise and WRIGHT replied to UC-2, "Saturday . . . I need it done." WRIGHT explained he intended to travel to Las Vegas during the requested time. As UC-2 and WRIGHT walked from the vehicle to the restaurant, WRIGHT explained that he controls two of the five suites within the building structure. Specifically, WRIGHT said that suites 1 and 3 are in WRIGHT's control and a vacant suite, previously used by a bail bonds company, exists between the two, with suite 3 being vacant as well.

b.   WRIGHT escorted UC-2 and walked through the two suites WRIGHT has control of. Specifically, WRIGHT escorted UC-2 into Suite 3, which appeared vacant, and explained to UC-2 that Suite 3 was also WRIGHT's. Based on UC-2's debrief to me and my review of UC-2's video recording of the meeting, Suite 3 appeared to be vacant. WRIGHT opened the rear door, on the south side, to Suite 3 for UC-2 to enter, but explained that the door was always unlocked. UC-2 asked WRIGHT if he wanted the arson localized and WRIGHT explained, "the less it looks like just me, fine. If three go, three go." UC-2 told me this statement was in reference to Suites 1, 2, and 3. I conducted physical surveillance of this meeting and saw WRIGHT and UC-2 walking to the south side of the building, but lost view of them

17

due to my vantage point, and I did not see them entering any doors.

      c.    WRIGHT then told UC-2 the sprinkler system in the building will be turned off until "Sunday Monday" and explained this was the reason he wanted the fire on Saturday. UC-2 asked WRIGHT if his insurance does not cover some things and WRIGHT said his policy covers everything.

      d.    WRIGHT pointed out the electrical outlets and explained the restroom in the restaurant shared a connecting wall with the additional suite WRIGHT controlled. WRIGHT told UC-2 he will collect $300,000 from the insurance policy on the restaurant. WRIGHT told UC-2 Suite 3 is always unlocked, but he keeps his restaurant locked at night. WRIGHT offered to let UC-2 in at any time if necessary. WRIGHT told UC-2 no one is around at night at the restaurant and warned UC-2 about a fire station located minutes away from the restaurant. WRIGHT said, "from the time it starts to the time they get here, it's probably about five minutes." UC-2 replied "Who?" WRIGHT explained, "the Fire Department. They are right down the street." WRIGHT then said, "So, I don't know if the gas line got be wide open, or whatever, I mean." WRIGHT continued, "I could shut the alarms off, and then make it look like the staff has made a mistake."

      e.    UC-2 agreed to the job and told WRIGHT the fee for the arson would be $1,500.

    5.   October 4, 2017 Telephone Call Between the CHS
and WRIGHT

31.  On October 4, 2017, under my supervision and at my
direction, the CHS audio-recorded a telephone call to WRIGHT.
WRIGHT did not know he was being recorded.  Based upon my review
of the recording and conversation with the CHS, I believe the
following subparagraphs accurately summarize portions of the
conversation:

    a.   During the call, WRIGHT told the CHS the
"electrician" came by on Tuesday (October 3, 2017).  WRIGHT
described the electrician as a paranoid individual and told the
CHS he was surprised the cost was only going to be $1,500.

    b.   WRIGHT described UC-2 as paranoid and said UC-2
would not touch anything during the October 3, 2017 meet.  The
CHS suggested UC-2 was potentially on drugs.  WRIGHT replied,
"that works for me, 'cause plausible deniability."

    c.   WRIGHT told the CHS, "he's [UC-2] supposed to
take care of everything on Saturday."

    6.   October 6, 2017 Meeting Between UC-2 and WRIGHT

32.  On October 6, 2017, under my supervision and at my
direction, UC-2 audio and video-recorded an in-person meeting
with WRIGHT at Fat Boyz Grill.  WRIGHT did not know he was being
recorded.  Based upon my review of the recording and
conversation with UC-2, I believe the following subparagraphs
accurately summarize portions of the conversation:

    a.   Prior to arrival, UC-2 requested WRIGHT place a
ladder or chair in the alleyway behind Fat Boyz Grill.  Upon

arrival, UC-2 observed WRIGHT waiting in the alley way with a ladder to allow UC-2 to look in an attic crawl space to assist with the planning of the arson. UC-2 then pulled his vehicle to the front of the restaurant and WRIGHT walked to the vehicle and sat in the front passenger seat next to UC-2.

b. UC-2 told WRIGHT the job required more time to prepare and would likely take one additional week. WRIGHT responded by saying, "Shit, I don't have no excuse to be gone next week." WRIGHT disclosed to UC-2 that he has involved one additional person who WRIGHT says is going to "pump the gas" in the restaurant. WRIGHT provided a black wristband with a small zipper to UC-2 and explained, "there's 15 right there." Inside the wristband was $1,500.

**E. INTERVIEW OF WRIGHT AND SEARCH OF FAT BOYZ GRILL ON OCTOBER 17, 2017**

33. On October 16, 2017, the court (Hon. Sheri Pym, United States Magistrate Judge) issued a federal search warrant for WRIGHT's restaurant, Fat Boyz Grill, in Case No. 5:17-MJ-00470.

1. October 17, 2017 FBI Interview of WRIGHT

34. On October 17, 2017, Special Agent Colin Schmitt and I conducted an audio and video recorded interview of WRIGHT at Fat Boyz Grill. WRIGHT did not know he was being recorded at the time. During the interview, WRIGHT was confronted with surveillance photographs of WRIGHT meeting with UC-2 on October 3, 2017 and October 6, 2017, which we knew concerned the arson plot. The following subparagraphs summarize portions of the meeting:

a.    WRIGHT initially told us that UC-2 was an
electrician WRIGHT had hired to conduct work at Fat Boyz Grill.
After WRIGHT was told that UC-2 audio- and video-recorded their
meetings and phone calls, and that I had reviewed those
recordings, WRIGHT reaffirmed that UC-2 was merely an
electrician.  I told WRIGHT that UC-2 was pending charges for an
unrelated criminal offense and was cooperating with the
investigation in an effort to get a reduced sentence.  I further
told WRIGHT that he was not under arrest and that we were
requesting his cooperation with a public corruption
investigation before charges are brought as to the arson plot.
WRIGHT then confessed to paying UC-2 to burn down Fat Boyz
Grill.  WRIGHT told me UC-2 said UC-2 could make sure "this
place be gone" (referring to Fat Boyz Grill).

b.    Following WRIGHT's confession to the attempted
arson plot, WRIGHT agreed to cooperate with the FBI's
investigation into corruption in the City of Adelanto, including
by surreptitiously using a recording device if requested to do
so by the FBI.  WRIGHT agreed to tell the truth and maintain
confidentiality of the FBI's investigation while he was
cooperating.

c.    During the interview, WRIGHT was not shown any
photographs of UC-1, or confronted with the controlled bribe
payment given to WRIGHT by UC-1 on October 6, 2017.  WRIGHT was
asked several times during the interview if he had engaged in
any acts of bribery or corruption.  WRIGHT denied ever taking a
bribe payment in return for an official act.

21

2.   Search of Fat Boyz Grill

35.   During the interview, WRIGHT was advised of the
federal search warrant issued the previous day, in Case No.
5:17-MJ-00470.   WRIGHT cooperated with the execution of the
search warrant.

36.   During the search warrant, one loaded Remington model
870 12-gauge shotgun was located in in the kitchen area of the
restaurant.   In addition, two handguns were found inside
WRIGHT's backpack, which was located in the restaurant.   WRIGHT
advised he had a concealed carry weapons permit issued in San
Bernardino County.   These weapons were not seized during the
search warrant.

**F.   WRIGHT'S ATTEMPTS TO OBSTRUCT THE INVESTIGATION DURING
HIS PERIOD OF COOPERATION**

1.   October 18, 2017 Conversation between CHS and
WRIGHT

37.   As described above, at our meeting on October 17,
2017, WRIGHT was told that UC-2 had been cooperating with the
investigation, but he was not told that UC-1 or CHS had been
cooperating with the investigation.

38.   On October 18, 2017, I received a telephone call from
the CHS in which the CHS told me WRIGHT had approached the CHS
without advance notice.   The CHS was not able to record the
conversation due to the impromptu nature of the contact.   WRIGHT
disclosed the FBI's search warrant on Fat Boyz Grill to the CHS
and told the CHS that UC-2 was a "snitch."   WRIGHT requested the
CHS's assistance in making UC-2 "go away."   WRIGHT told the CHS
that with UC-2 gone, no one could testify against WRIGHT, and

the government would have to dismiss the case.  During the same meeting, WRIGHT provided a new "burner" cell phone number, 442-247-XXXX, to the CHS which WRIGHT advised he acquired after the execution of the search warrant.  The CHS reported to the FBI that WRIGHT was soliciting the CHS's assistance to have UC-2 murdered.

39.  On October 18, 2017, at my direction and under my supervision, the CHS audio-recorded an in-person conversation with WRIGHT in Adelanto.  Based upon my review of the recording and conversation with the CHS and WRIGHT, I believe the following subparagraphs accurately summarize portions of the conversation:

a.  WRIGHT did not specifically tell the CHS he wanted UC-2 murdered, but told the CHS, "You brought shit to my door, I am already in enough hot water as it is, you brought shit to my door, get shit off my door."

b.  WRIGHT later told the CHS, "do whatever you do to get shit off my door."  WRIGHT told the CHS, "I have a defense attorney that can beat anything.  The shit has to go away from my front door."

c.  WRIGHT also told the CHS, "they [the FBI] want to flip me and there's there's, look, this is all they have on me."  WRIGHT finished the conversation telling the CHS, "Whatever you do, don't come back to you, and doesn't come back to me, and I don't give a fuck what happens.  I really don't, but this shit needs to be cleaned up."

23

2.   October 20, 2017 Interview of Jermaine WRIGHT

40.   On October 20, 2017, I conducted an interview of Jermaine WRIGHT at the FBI Victorville Resident Agency.   The interview was recorded with WRIGHT's knowledge.   During the interview, WRIGHT told me the following, in part:

a.   WRIGHT explained the training he has received as an elected official, which was described as online training, covering California Assembly Bill 1234, the Brown Act, Sexual Harassment, and minimal training in bribery.

b.   WRIGHT explained he was estranged from his wife and is dealing with personal issues related to his marriage.

3.   October 23, 2017 Conversation between CHS and WRIGHT

41.   On October 23, 2017, at my direction and under my supervision, the CHS audio-recorded an in-person conversation with WRIGHT in Adelanto.   Based upon my review of the recording and conversations with the CHS and WRIGHT, I believe the following subparagraphs accurately summarize portions of the conversation:

a.   WRIGHT started the conversation by asking the CHS, "so, how much is it going to cost to get my ass beat?" WRIGHT continued, "and it needs to happen quickly though." WRIGHT continued, "Beat to the point where I have memory loss, all the rest of the stuff, they have to let me go . . . I have a good ass attorney."

b.   WRIGHT explained that he wanted to be assaulted for two reasons.   WRIGHT said the first benefit was that

24

WRIGHT's wife would return to him and comfort him while he is in the hospital. WRIGHT said the second benefit was the dismissal of criminal charges due to memory loss WRIGHT would claim he suffered as a result of the assault. During the discussion, WRIGHT said, "like, get knocked the fuck out in front of the restaurant."

   c. WRIGHT attempted to set a plan to have the CHS commit the planned assault on himself. WRIGHT then told the CHS, "there's are no cameras out front of the restaurant." WRIGHT also told the CHS the cameras inside are not functioning either. WRIGHT then told the CHS, "four o'clock in the morning, I'm there . . . it has to be between four and four thirty because the people behind me start coming in at four thirty." Based on my knowledge of Fat Boyz Grill, WRIGHT is referring to employees of other businesses located in the same shopping center. WRIGHT told the CHS to "put a rat next to me." WRIGHT explained his reason for the rat, "they [the FBI] would suspect someone has found out that I have talked to them [the FBI], and they're sending me a message." WRIGHT continued, "I am going to lose at least three months of memory or more."

   d. The CHS engaged in the conversation, but would not commit to assaulting WRIGHT himself. The CHS told WRIGHT about the dangers of getting hit in the head. WRIGHT responded, "They gotta hit me in the head." WRIGHT continued, "I just need to be fucked up, real good." WRIGHT explained he could place $500 or $600 in his pocket so the person hired to assault WRIGHT could take the money as payment, making it appear as a robbery.

WRIGHT told the CHS he obtained the idea to set up the assault from a family law attorney who is a friend of WRIGHT.  WRIGHT requested to be assaulted on Friday, October 27, 2017.  When the CHS refused, he asked the CHS to assault him one day earlier, on Thursday, October 26, 2017.

e.   WRIGHT then summarized the conversation, "six hundred bucks in my pocket, Thursday morning, I'm there at three-thirty in the morning out front.  I'm there.  My wife drops me off, or drops off the barbeque grill.  I start setting the fire I'm outside."

4.   October 24, 2017 Conversation between CHS and WRIGHT

42.   On October 24, 2017, at my direction and under my supervision, the CHS audio-recorded an in-person conversation with WRIGHT in Adelanto.  Based upon my review of the recording and conversations with the CHS and WRIGHT, I believe the following subparagraphs accurately summarize portions of the conversation:

a.   WRIGHT told the CHS, "What am I supposed to do, I am still underneath this federal bullshit."  WRIGHT continued later in the conversation, "I've got to get this over quickly."  WRIGHT then said "Thursday is perfect."  Based on the context of the statement and in light of the above-described conversation of October 23, 2017, I believe WRIGHT was referring to the staged assault on himself.

b.   The CHS told WRIGHT the staged assault is very dangerous and WRIGHT responded, "I am not asking you to kill me

26

. . . I am not asking you to beat me within an inch of my life."
The CHS told WRIGHT he could have someone from Sacramento come
down to meet WRIGHT before handling the staged assault. WRIGHT
told the CHS, "I don't want to know who hits me."

     c.   WRIGHT told the CHS, "I need to be knocked out
when the police get there . . . get there at 4, knock my ass
out, people get start pulling up over there at 4:30." WRIGHT
continued, "it has to be a Thursday or Friday" because WRIGHT
operates his barbeque on those days.

     d.   During the conversation, WRIGHT disclosed his
cooperation with the FBI, the content of his discussions with
the FBI, and the information sought by the investigation.

     5.   October 25, 2017 Interview of WRIGHT

   43.  On October 25, 2017, I conducted an interview of
WRIGHT at the FBI Victorville Resident Agency. The interview
was recorded with WRIGHT's knowledge. During the interview,
WRIGHT told me the following in part:

     a.   WRIGHT was asked why he had contacted the CHS
multiple times since the October 17, 2017 search warrant. I
told WRIGHT I knew about these contacts through physical
surveillance of WRIGHT. To my knowledge, WRIGHT was not aware
of the CHS's role in the investigation. WRIGHT told me the CHS
is one of his only friends, the CHS was helping WRIGHT work
through his personal issues, and the CHS was helping WRIGHT find
a new waitress for Fat Boyz Grill. WRIGHT did not disclose the
aforementioned conversations with the CHS during which the

potential murder of UC-2 and the scheme to stage an assault on WRIGHT were discussed.

b.    WRIGHT maintained that the conversations between himself and the CHS involved the issues with WRIGHT's personal life. WRIGHT said, "I am trying to deal with the fact that I am losing my wife, I am losing my life for what I've done, and I needed someone to talk to, and I'm talking to him as a friend."

c.    WRIGHT told me he is going through a lot in his life. WRIGHT said, "Friday, I put a shotgun in my mouth, I was ready to blow myself away, that's just where I was at." WRIGHT then advised he backed off from suicidal thoughts. WRIGHT said the CHS helped "talk him off the mountain."

d.    WRIGHT was questioned about his finances. WRIGHT said that he had opened an account at Alaska USA Federal Credit Union for the purpose of obtaining cashier's checks to purchase two cars. WRIGHT opened the account with a deposit of $35,000 cash. WRIGHT was asked where the cash came from and WRIGHT told me he keeps large amounts of cash in his residence. WRIGHT advised he is a "prepper" and is always prepared just in case something ever happens. WRIGHT estimated he currently has about $25,000 to $30,000 in cash at his residence. WRIGHT denied the $35,000 cash deposit was related to the May 2017 vote to allow medical marijuana dispensaries in Adelanto. WRIGHT further explained his financial habit of keeping cash derived from his childhood because his mother did the same thing.

e.    WRIGHT explained that his monthly earnings from Fat Boyz Grill are approximately $10,000. WRIGHT also said that

he earns approximately $800 to $900 per month for his services
as the Mayor Pro Tem for the City of Adelanto.

f.    WRIGHT confirmed he had a $300,000 insurance
policy on Fat Boyz Grill through State Farm, but did not believe
he would obtain the full amount from the aforementioned arson
for hire. WRIGHT again admitted he paid UC-2 the $1,500 for the
arson on Fat Boyz Grill.

g.    At the conclusion of the interview, I requested
WRIGHT to place a consensually recorded telephone call to the
CHS, which WRIGHT agreed to do. During the telephone call, the
CHS began to speak to WRIGHT about the scheme to assault WRIGHT.
WRIGHT began interrupting the CHS and yelled into the phone in
an apparent attempt to overpower the CHS's words. WRIGHT
eventually terminated the call to the CHS prematurely. WRIGHT
then appeared agitated with heavy breathing and then uttered the
phrase, "he's gonna go there. Oh, shit."

44.   The following day, on October 26, 2017, I told WRIGHT
I had reviewed the recorded call between WRIGHT and the CHS
generated during my October 25, 2017 meeting with WRIGHT. I
asked WRIGHT why the CHS spoke of someone coming from Sacramento
to beat up WRIGHT. WRIGHT explained the statement was in
reference to an upcoming celebrity boxing match WRIGHT had
signed up to participate in.

6.    November 3, 2017 Alleged Assault of WRIGHT at Fat
      Boyz Grill

45.   On Friday, November 3, 2017, I received a telephone
call from Deputy T. James, who advised he worked for the San

29

Bernardino County Sheriff's Department (SBCSD) at the Adelanto
Station. Deputy James told me that WRIGHT was the subject of a
medical aid call at Fat Boyz Grill, and that he had obtained my
phone number from WRIGHT. As a result, FBI SA Matthew Tylman
and I drove to the Adelanto Sheriff's Station to obtain more
information. The following information was obtained from SBCSD
regarding the incident (Incident Report 241703081):

      a.    At approximately 7:00 AM on November 3, 2017,
SBCSD received a call for service related to medical aid at Fat
Boyz Grill. The reporting party was an employee at Fat Boyz
Grill. WRIGHT was located lying on the ground near WRIGHT's
barbeque in the parking lot of Fat Boyz Grill. According to
Deputy James, the Adelanto Fire Department was on scene, but
WRIGHT had no visible injuries. Deputy James advised WRIGHT was
ultimately transported to a local hospital for a medical
evaluation.

      b.    WRIGHT told Deputy James to call me and provided
my phone number from WRIGHT's cell phone contacts list. WRIGHT
also told Deputy James that the broken device located on the
ground close to where WRIGHT was laying was my property. The
broken device was an audio recording device I had provided to
WRIGHT on October 30, 2017 for the purpose of consensually
recording a conversation in furtherance of FBI's public
corruption investigation in Adelanto. This device is property
of the U.S. Government. Deputy James told me WRIGHT made a
comment paraphrased as, "they tried to get [the device] from
me." The broken pieces of the device were collected by Deputy

30

James and were returned to me during my conversation with Deputy James.

      c.    WRIGHT provided no suspect information and did not tell Deputy James he was robbed of any property or money at the scene.

    46.  On November 3, 2017, following my meeting with SBCSD, SA Tylman and I conducted an interview of WRIGHT at St. Mary's Hospital in Apple Valley, California.  WRIGHT was located on a hospital bed placed in a hallway and did not appear to be receiving treatment at the time.  WRIGHT had no visible injuries and was using his cell phone to text at the time we contacted him.  WRIGHT's rarely looked me in the eye, spoke quietly, and took a significant amount of time to answer questions compared with my previous encounters with WRIGHT.

      a.   WRIGHT was asked to explain what occurred earlier in the day.  WRIGHT told me he was near his barbeque and a male of unknown race, who was taller than WRIGHT, hit WRIGHT over WRIGHT's right eye multiple times with an unknown object.  WRIGHT believed it may have been a wooden object.  WRIGHT did not know the person.  WRIGHT said the person said, "don't make me come back and finish . . . ."

      b.   WRIGHT was asked if anything was taken from him.  WRIGHT advised he was robbed of his payroll.  WRIGHT said he had $2,000 to $3,000 in his pocket at the time and the money is now missing.  WRIGHT said he always paid his employees in cash in the normal course of business.

c. WRIGHT took several seconds, and sometimes minutes, to answer questions. Eventually WRIGHT told me he was scared to speak with me in a public setting. I asked WRIGHT to contact me after he felt better.

47. On November 3, 2017, approximately two hours after interviewing WRIGHT in the hospital, WRIGHT contacted SA Tylman via cell phone, which was placed on "speaker phone," so I could take part in the conversation. WRIGHT spoke in a manner much more consistent with my prior encounters with WRIGHT and did not hesitate like he did in the hospital. WRIGHT expressed his belief that the FBI had surveillance on him and asked why the FBI did not intervene to stop the attack on him. We told WRIGHT that no FBI surveillance assets were in the area at the time of the attack. WRIGHT told us he had been lying on the ground freezing for two to three hours before help arrived at approximately 7:00 AM. WRIGHT was afraid to move after the incident. WRIGHT advised he was given a "cat scan" at the hospital, which showed "no abnormalities." WRIGHT told us the doctor advised WRIGHT may have a mild concussion and some memory loss. WRIGHT advised he was not discharged from the hospital and simply got up and walked out of the hospital on his own. WRIGHT opined that the person responsible for the attack may have learned WRIGHT was cooperating with the FBI.

**G. NOVEMBER 1, 2017 JUVENILE HIGH SCHOOL STUDENT AT SILVERADO HIGH SCHOOL ARRESTED FOR POSSESSION OF A FIREARM REGISTERED TO WRIGHT**

48. According to a SBCSD initial report (case number 171713225), provided to me on November 3, 2017, SBCSD responded

to Silverado High School in Victorville, California after receiving a call from the school administration of a sixteen year old male student in possession of a Glock, model 21, .45 caliber handgun and an associated magazine containing nine .45 caliber cartridges. SBCSD conducted an investigation into the firearm at the school, pursuant to California Penal Code Sections 626.95(a) and 626.9. During the investigation, SBCSD determined the registered owner of the firearm to be Jermaine WRIGHT.

49. Based on interviews of the juvenile, his father, and WRIGHT, SBCSD's investigation determined WRIGHT had loaned the firearm to the juvenile's family in late June 2017 and never retrieved the firearm. On or about November 1, 2017, the juvenile took the firearm from his father's closet and brought it to Silverado High School. Based on interviews of the juvenile, his father, and WRIGHT, it was determined WRIGHT provided the firearm for the purpose of security and protection at a firework stand serving as a fundraiser for the Adelanto Hurricanes youth sports organization, in which the juvenile's family worked. WRIGHT never retrieved the firearm when the firework stand closed after July 4, 2017. The firearm was then maintained by the juvenile's father, who is a convicted felon.

///

///

33

## V.  CONCLUSION

50.  Based upon the evidence described above, I submit that probable cause exists to support the issuance of a criminal complaint against Jermaine WRIGHT for violations of Title 18, United States Code, Sections 844(i) (attempted arson of a building affecting interstate commerce) and 666(a)(1)(B) (bribery of programs receiving federal funds).

/s/
_____
KEVIN M. BOLES
Special Agent, FBI

Subscribed to and sworn before me
this __6__ day of November, 2017.

KENLY KIYA KATO

_____
UNITED STATES MAGISTRATE JUDGE

34