TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JERRY C. YANG
Assistant United States Attorney
Chief, Riverside Branch Office
SEAN D. PETERSON (Cal. Bar No. 274263)
Assistant United States Attorney
Riverside Branch Office
    3403 10th Street, Suite 200
    Riverside, California 92501
    Telephone: (951) 276-6930
    Facsimile: (951) 276-6202
    E-mail:   Sean.Peterson2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>         v.<br><br>JERMAINE WRIGHT,<br><br>       Defendant. | ED CR No. 17-229-JGB<br><br>AMENDED TRIAL MEMORANDUM<br><br>Trial Date:  June 14, 2022<br>Trial Time:  9:00 a.m.<br>Location:    Courtroom of the<br>               Hon. Jesus G.<br>               Bernal |

      Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Sean D. Peterson, hereby files an amended trial memorandum.  The previous trial memorandum was amended primarily because the two counts in the indictment which had been severed, were then rejoined for trial. This memorandum addresses a trial on the two counts: bribery of programs receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B), and attempted arson of a building affecting interstate commerce, in violation of 18 U.S.C. §§ 844(i), 2(b).

1    Should any legal or factual issues arise that have not been

2  addressed in this trial memorandum, the prosecution respectfully

3  requests leave to submit such further memoranda as may be necessary.

4  Dated: June 6, 2022              Respectfully submitted,

5                                    TRACY L. WILKISON
                                     United States Attorney
6
                                     SCOTT M. GARRINGER
7                                    Assistant United States Attorney
                                     Chief, Criminal Division
8
                                     JERRY C. YANG
9                                    Assistant United States Attorney
                                     Chief, Riverside Branch Office
10
                                     _____/s/_____
11                                   SEAN D. PETERSON
                                     Assistant United States Attorney
12
                                     Attorneys for Plaintiff
13                                   UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

DESCRIPTION                                                                    PAGE

TABLE OF AUTHORITIES...................................................iv

MEMORANDUM OF POINTS AND AUTHORITIES...................................1

I.   CASE STATUS......................................................1

II.  STIPULATIONS.....................................................1

III. CHARGES..........................................................2

     A.   INDICTMENT..................................................2

     B.   ELEMENTS OF BRIBERY OF PROGRAMS RECEIVING FEDERAL
          FUNDS.......................................................2

     C.   ELEMENTS OF ATTEMPTED ARSON OF A BUILDING AFFECTING
          INTERSTATE COMMERCE.........................................3

     D.   AIDING AND ABETTING (CAUSING)...............................4

IV.  STATEMENT OF FACTS...............................................5

     A.   CHRONOLOGICAL SUMMARY OF EVENTS.............................5

          1.   Investigation Initiated...............................5

          2.   June 15, 2017 Meeting Between Defendant, Steve,
               and CHS...............................................5

          3.   June 20, 2017 Conversation Between Defendant and
               Steve.................................................6

          4.   July 26, 2017 Meeting Between Defendant and Steve....6

          5.   August 3, 2017 Conversation Between Defendant and
               CHS...................................................6

          6.   August 25, 2017 Conversation Between Defendant
               and CHS...............................................7

          7.   August 31, 2017 Conversation Between Defendant
               and CHS...............................................7

          8.   September 26, 2017 Conversation Between Defendant
               and CHS...............................................7

          9.   September 28, 2017 Conversation Between Defendant
               and UC................................................8

          10.  October 3, 2017 Meeting Between Defendant and
               UCE5001 at Restaurant.................................8

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                          PAGE

      11.  October 4, 2017 Conversation Between Defendant
          and CHS.........................................10

      12.  October 5, 2017 Conversation Between Defendant
          and UC Setting Up Next Meeting......................10

      13.  October 6, 2017 Meeting Between Defendant and
          UCE5001 at Restaurant..............................10

      14.  October 6, 2017 Meeting Between Defendant, the
          CHS, and Steve at the CHS's Shop in Adelanto.......11

      15.  October 13, 2017 Conversation Between UC and
          Defendant in Which They Agree the Arson will
          Occur on Tuesday, October 17, 2017.................12

      16.  October 17, 2017: Law Enforcement Confronts
          Defendant Concerning His Interactions with
          UCE5001............................................12

      17.  October 18, 2017: Defendant told the CHS that the
          FBI Knew About the Electrician and Enlisted the
          CHS's Help to "Get Shit Off [His] Door"............13

      18.  October 23-25, 2017: Defendant Spoke With the CHS
          About Hiring Someone to Assault Him so that He
          Could Feign Memory Loss............................13

      19.  November 2-3, 2017: The CHS told Defendant that
          the Electrician Was Gone; the Next Day Defendant
          Reported that He was Assaulted.....................14

  B.  INFORMATION RELATING THE RESTAURANT'S USE IN
      INTERSTATE OR FOREIGN COMMERCE, OR ITS USE IN AN
      ACTIVITY AFFECTING INTERSTATE COMMERCE...................14

      1.  The Real Property was a Commercial Rental
          Property, Which Housed a Restaurant................14

      2.  Fat Boyz Grill Utilized Products and Services
          From Many Out-of-State Businesses..................15

      3.  The Property Is Close to U.S. Route 395............15

      4.  Wells Fargo Records Reflect Use of Wires
          Involving Restaurant and Payments to Interstate
          Vendors............................................15

V.  LEGAL AND EVIDENTIARY ISSUES.................................15

  A.  INTERSTATE COMMERCE ELEMENT OF ARSON CHARGE.............15

ii

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                        PAGE

       1.   Rental Property and Restaurants Affect Interstate
           Commerce...........................................15

B.   SUBSTANTIAL STEP.......................................16

       1.   Multiple Steps Taken By Defendant Were
           Substantial Steps..................................16

       2.   Jurors Need Not Agree on What Act or Actions
           Constituted a Substantial Step.....................18

C.   RECORDINGS OF CONVERSATIONS............................18

D.   STILL IMAGES (PHOTOGRAPHS).............................21

E.   PHYSICAL EVIDENCE......................................21

F.   SELF-AUTHENTICATING RECORDS............................23

G.   CROSS-EXAMINATION OF DEFENDANT.........................24

H.   RECIPROCAL DISCOVERY..................................25

1

**TABLE OF AUTHORITIES**

2  DESCRIPTION                                                    PAGE

3  **CASES**

4  Bourjaily v. United States, 483 U.S. 171, 178-79 (1987)............23

5  Crawford v. Washington, 541 U.S. 36 (2004).........................24

6  Fitzpatrick v. United States, 178 U.S. 304 (1971).................25

7  Gallego v. United States, 276 F.2d 917 (9th Cir. 1960)............22

8  Hunter v. Bryant, 502 U.S. 224 (1991).............................23

9  Kennedy v. Los Angeles Police Dep't, 901 F.2d 717 (9th Cir.
       1990)..........................................................23
10
   La Porte v. United States, 300 F.2d 880 (9th Cir. 1962)...........24
11
   Ohio v. Roberts, 448 U.S. 56 (1980)...............................24
12
   Russell v. United States, 471 U.S. 858 (1985).....................15
13
   Togonon v. Garland, 23 F.4th 876 (9th Cir. 2022)...................3
14
   United States v. Baker, 855 F.2d 1353 (8th Cir. 1988)............24
15
   United States v. Black, 767 F.2d 1334 (9th Cir. 1985).........22, 25
16
   United States v. Blackwood, 878 F.2d 1200 (9th Cir. 1989).........22
17
   United States v. Brown, 604 F.2d 347 (5th Cir. 1979)..............17
18
   United States v. Bunney, 705 F.2d 378 (10th Cir. 1983)...........17
19
   United States v. Chen, 754 F.2d 817 (9th Cir. 1985)..............18
20
   United States v. Childs, 5 F.3d 1328 (9th Cir. 1993).............24
21
   United States v. Chu Kong Yin, 935 F.2d 990 (9th Cir. 1991).......22
22
   United States v. Collicott, 92 F.3d 973 (9th Cir. 1996)..........20
23
   United States v. Cuozzo, 962 F.2d 945 (9th Cir. 1992)............25
24
   United States v. Darby, 857 F.2d 623 (9th Cir. 1988).............16
25
   United States v. Fernandez, 839 F.2d 639 (9th Cir. 1988).........20
26
   United States v. Goetzke, 494 F.3d 1231 (9th Cir. 2007)..........16
27
   United States v. Gracidas-Ulibarry, 231 F.3d 1188 (9th Cir.
       2000)..........................................................16
28

iv

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                PAGE

<u>United States v. Gullett</u>, 75 F.3d 941 (4th Cir. 1996)...............3

<u>United States v. Harrington</u>, 923 F.2d 1371 (9th Cir. 1991).........22

<u>United States v. Hofus</u>, 598 F.3d 1171 (9th Cir. 2010)..............18

<u>United States v. Matta-Ballesteros</u>, 71 F.3d 754 (9th Cir. 1995)....19

<u>United States v. May</u>, 622 F.2d 1000 (9th Cir. 1980)...............21

<u>United States v. Norton</u>, 867 F.2d 1354 (11th Cir. 1989)...........24

<u>United States v. Oaxaca</u>, 569 F.2d 518 (9th Cir. 1978).............21

<u>United States v. Ortega</u>, 203 F.3d 675 (9th Cir. 2000)..............20

<u>United States v. Phillips</u>, 577 F.2d 495 (9th Cir. 1978)...........18

<u>United States v. Ray</u>, 930 F.2d 1368 (9th Cir. 1990)...........23, 24

<u>United States v. Rrapi</u>, 175 F.3d 742 (9th Cir. 1999)..............19

<u>United States v. Serang</u>, 156 F.3d 910 (9th Cir. 1998).............16

<u>United States v. Snell</u>, 627 F.2d 186 (9th Cir. 1980)..............16

<u>United States v. Stearns</u>, 550 F.2d 1167 (9th Cir. 1977)...........21

<u>United States v. Torres</u>, 908 F.2d 1417 (9th Cir. 1990)............19

<u>United States v. Valerio</u>, 441 F.3d 837 (9th Cir. 2006)............20

<u>United States v. Young</u>, 248 F.3d 260 (4th Cir. 2001)..............25

**STATUTES**

18 U.S.C. § 666(a)(1)(B)...........................................2

18 U.S.C. § 844(i).............................................2, 3, 15

**MODEL CRIMINAL JURY INSTRUCTIONS**

Ninth Circuit Model Criminal Jury Instructions, No. 4.2 (2022
    ed.) [Aiding and Abetting (18 U.S.C. § 2(b))]..................4

Ninth Circuit Model Jury Instructions, No. 4.4 (2022 ed.)
    [Attempt].....................................................3

Seventh Circuit Model Criminal Jury Instructions (2020 ed.)
    [Accepting a Bribe – Elements].................................2

**TABLE OF AUTHORITIES (CONTINUED)**

DESCRIPTION                                                                 PAGE

**RULES**

Fed. R. Evid. 104(a)...............................................23

Fed. R. Evid. 801(c)............................................19, 20

Fed. R. Evid. 801(d)(2).........................................21

Fed. R. Evid. 901..............................................22

Fed. R. Evid. 901(b)(5).......................................19

Fed. R. Evid. 803(6)..........................................23

Fed. R. Evid. 901(a)........................................19, 22

Fed. R. Evid. 902(11).......................................23, 24

Fed. R. Evid. 1101(d)(1)....................................23

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   CASE STATUS

A jury trial is set for June 14, 2022 at 8:30 a.m. before the Honorable Jesus G. Bernal.  Defendant is released on bond pending trial.  The estimated time for the prosecution's case-in-chief, including cross-examination is four days.  The prosecution currently anticipates calling an Under Cover Federal Bureau of Investigation employee ("UC"),[1] a Confidential Human Source ("CHS"),[2] Kevin Boles, and Steven Gale.[3]  The prosecution anticipates that all testimony will be in English.

No motions are currently pending.

## II.   STIPULATIONS

The parties have reached agreement as to one factual stipulation, namely, that defendant rented Suite 1 of a building located at 11619 Rancho Road in Adelanto, California from the owner of the building, and that defendant operated his restaurant, Fat Boyz Grill, at that location.  (CR 103.)

---

[1] The parties are working on a stipulation for the testimony of a second undercover employee, UCE5360, who went by the name of "Steve," during the investigation.

[2] The prosecution seeks to refer to the CHS and both UCs via pseudonyms throughout trial to publicly protect the identity of the CHS and the UCs, and also, in the case of the UCs, to enable the UCs to continue to work as undercover employees in other cases, and to protect the integrity of any other investigations in which the UCs may have previously worked as undercover employees.

[3] The prosecution is currently evaluating whether to also call R. Falconer, L. Garrett, or T. James, among others, as witnesses to events on November 3, 2017, and in the case of R. Falconer and L. Garrett, as witnesses to the manner and means of operation of Fat Boyz Grill.  The prosecution is also currently evaluating whether to call A. Castellanos as a witness concerning federal fund received by the City of Adelanto.

1  The parties are in discussions concerning other possible
2  stipulations.  Specifically, the parties have discussed stipulating
3  to the receipt by the City of Adelanto of Federal funds, the
4  testimony of FBI UCE5360 "Steve," the authenticity and admissibility
5  of certain financial records described below (i.e., the Wells Fargo
6  records), and the prosecution has inquired with the defense as to the
7  possibility of a broader stipulation concerning the admissibility of
8  additional anticipated trial exhibits.  Regardless, no additional
9  stipulations have been made as of the filing of this trial
10 memorandum.

11 **III. CHARGES**

12  **A.  INDICTMENT**

13  On November 15, 2017, the Grand Jury issued a two-count
14 indictment against defendant, charging him with bribery of programs
15 receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B),
16 and attempted arson of a building affecting interstate commerce, in
17 violation of 18 U.S.C. §§ 844(i), 2(b).

18  **B.  ELEMENTS[4] OF BRIBERY OF PROGRAMS RECEIVING FEDERAL FUNDS**

19  First, the defendant was an agent of the City of Adelanto;

20  Second, the defendant solicited, accepted, or agreed to accept
21 something of value from another person;

22  Third, the defendant did so corruptly with the intent to be
23 influenced or rewarded in connection with some business or
24 transaction of the City of Adelanto;

25

26

27  _____

28  [4] The elements were drawn from the following authorities: 18
U.S.C. §§ 666(a)(1)(B), 666(d); Seventh Circuit Model Criminal Jury
Instructions (2020 ed.) [Accepting a Bribe – Elements].

2

Fourth, this business or transaction involved something of a value of $5,000 or more; and

Fifth, the City of Adelanto, in a one year period, received benefits of more than $10,000 under any Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other assistance.  [The one-year period must begin no more than 12 months before the defendant committed these acts and must end no more than 12 months afterward.]

A person acts corruptly when that person acts with the understanding that something of value is to be offered or given to reward or influence him in connection with his duties.

The term "agent" means a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative.

C.    **ELEMENTS[5] OF ATTEMPTED ARSON OF A BUILDING AFFECTING INTERSTATE COMMERCE**

First, defendant intended to damage or destroy real property, namely, Suites 1 and 3 of a building located at 11619 Rancho Road, in Adelanto, California, which included Fat Boyz Grill, a restaurant in Suite 1, by means of fire or an explosive;

---

[5] The elements were drawn from the following authorities: 18 U.S.C. § 844(i); Ninth Circuit Model Jury Instructions, No. 4.4 (2022 ed.) [Attempt]; Togonon v. Garland, 23 F.4th 876, 878 (9th Cir. 2022) (maliciously is satisfied if the defendant acted intentionally or "with willful disregard of the likelihood that damage or injury would result from his or her acts"); accord United States v. Gullett, 75 F.3d 941, 947-48 (4th Cir. 1996).

3

1    Second, at the time that the fire or explosion would have

2  occurred, the real property was used in interstate or foreign

3  commerce, or was used in an activity affecting interstate commerce;

4    Third, defendant acted maliciously, in that he acted

5  intentionally or with deliberate disregard of the likelihood that

6  damage or injury would result from his acts;

7    Fourth, defendant did something that was a substantial step

8  toward committing the crime and that strongly corroborated the

9  defendant's intent to commit the crime.

10    Mere preparation is not a substantial step toward committing the

11  crime.  To constitute a substantial step, a defendant's act or

12  actions must unequivocally demonstrate that the crime will take place

13  unless interrupted by independent circumstances.

14    Jurors do not need to agree unanimously as to which particular

15  act or actions constituted a substantial step toward the commission

16  of a crime.

17    **D.   AIDING AND ABETTING (CAUSING)** [6]

18    A defendant may be found guilty of attempted arson affecting

19  interstate commerce even if the defendant did not personally commit

20  the act constituting the crime if the defendant willfully caused an

21  act to be done that if directly performed by him would be an offense

22  against the United States.  A defendant who puts in motion or causes

23  the commission of an indispensable element of the offense may be

24  found guilty as if he had committed this element himself.

25

26

27

28    [6] Drawn from Ninth Circuit Model Criminal Jury Instructions, No.
4.2 (2022 ed.) [Aiding and Abetting (18 U.S.C. § 2(b))].

4

1

2

**IV.   STATEMENT OF FACTS**

    **A.   CHRONOLOGICAL SUMMARY OF EVENTS**

    The prosecution intends to prove at trial the following facts, among others:

        1.   <u>Investigation Initiated</u>

    In early 2017, the FBI opened an investigation into allegations of public corruption in the City of Adelanto, California involving defendant, then a City Council Member and also Mayor Pro Tem of the City of Adelanto.  At that time, defendant operated a restaurant known as Fat Boyz Grill, located in Suites 1 and 3 of a building located at 11619 Rancho Road, in Adelanto, California.  During the investigation, the FBI identified a witness who already worked in Adelanto and who was familiar with defendant, among other people involved in City government.  That witness agreed to assist the FBI in its investigation, and the FBI designated that person as a CHS.

        2.   <u>June 15, 2017 Meeting Between Defendant, Steve, and CHS</u>

    On or about June 15, 2017, the CHS introduced an undercover FBI employee (UCE5360) who went by the name of "Steve" to defendant at defendant's restaurant, Fat Boyz Grill in Adelanto, California. Among other things, during that meeting Steve told defendant that Steve was interested in moving his marijuana cultivation business to Adelanto, Steve asked about the best way to get permits, licenses, and other approvals necessary for operation, and Steve said he was interested in purchasing a commercial property outside of the approved zone for marijuana cultivation at a reduced price, and then attempt to have the land re-zoned by the City Council.  Defendant said that the price for his vote for such an extension would be "20,"

5

1   meaning $20,000.  Defendant also said that he only accepted cash,

2   which would be "donated" through a third party who was not present,

3   and he provided Steve with the phone number for his "burner" phone.

4   (This conversation was not recorded.)

5         3.   <u>June 20, 2017 Conversation Between Defendant and Steve</u>

6         On or about June 20, 2017, Steve placed a recorded telephone

7   call to defendant.  During that call Steve and defendant returned to

8   part of their discussion from the previous meeting, specifically, the

9   price for each City Council Member to vote to extend the zone for

10  cultivating marijuana.

11        4.   <u>July 26, 2017 Meeting Between Defendant and Steve</u>

12        On July 26, 2017, Steve met with defendant at Fat Boyz Grill,

13  where they had a recorded conversation.  A couple of weeks before

14  that meeting, the City Council had voted to expand the cultivation

15  zone for marijuana, but Steve had not yet bought or leased a location

16  within the newly rezoned area prior to the vote by the City Council.

17  Defendant told Steve that defendant tried to warn Steve before the

18  vote, but Steve did not receive any message from defendant.  During

19  this meeting, defendant told Steve to obtain a location within the

20  expanded cultivation zone, and defendant said that he would assist

21  Steve with "pushing" permits.  Defendant spoke about a "donation" by

22  Steve of $15,000 as part of the package for pushing the permits.

23        5.   <u>August 3, 2017 Conversation Between Defendant and CHS</u>

24        On or about August 3, 2017, the CHS had a conversation with

25  defendant in which defendant requested, among other things,

26  assistance finding someone who can help burn down defendant's

27  business, Fat Boyz Grill, so that defendant could collect the

28  insurance money.  (This conversation was not recorded.)

6

1          6.   <u>August 25, 2017 Conversation Between Defendant and CHS</u>

2    On or about August 25, 2017, the CHS had a conversation with

3    defendant in which defendant reaffirmed his desire to have the CHS

4    find someone to burn down defendant's business, Fat Boyz Grill.

5    Defendant told the CHS he requested the arson to appear as an

6    accident caused by an electrical problem.  Defendant told the CHS he

7    was willing to pay for the services after the insurance money was

8    collected.  (This conversation was not recorded.)

9          7.   <u>August 31, 2017 Conversation Between Defendant and CHS</u>

10   On or about August 31, 2017, in a recorded conversation,

11   defendant explained to the CHS that defendant was in contact with a

12   marijuana business that would pay defendant and the CHS a total of

13   $20,000, for choosing that business as one of four to receive a

14   marijuana dispensary permit in the City of Adelanto.  Defendant

15   explained how the money needed to go to a non-profit to conceal what

16   they were doing, and defendant said that he would put the CHS on the

17   board of defendant's non-profit so that the CHS could receive money

18   as well.  During that conversation the CHS told defendant that Steve

19   wanted to rent a corner lot that the CHS owned in Adelanto to operate

20   a marijuana transportation company.  Defendant told the CHS that

21   Steve would need an exemption, and that defendant wanted his "ten,"

22   meaning $10,000, for Steve to receive his exemption.

23         8.   <u>September 26, 2017 Conversation Between Defendant and
     CHS</u>
24

25   On or about September 26, 2017, in a recorded conversation,

26   defendant gave permission for the CHS to pass defendant's cellular

27   telephone number to the "electrician," i.e., the arsonist who

28   defendant had previously discussed with the CHS.

                                     7

1    During that same conversation, the CHS told defendant that Steve
2    had signed a lease to rent a property from the CHS and operate a
3    marijuana transportation business outside of the approved zone.
4    Defendant said it could not operate out of the zone, and said he
5    would talk to a third party about using that third party's address,
6    which was in the zone.

7         9.   September 28, 2017 Conversation Between Defendant and
8              UC

9    On or about September 28, 2017, FBI UCE5001, as the employee was
10   designated for purposes of the investigation, acting in the role of
11   an arsonist, placed a recorded telephone call to defendant's
12   telephone number.  UCE5001 did not identify himself, but UCE5001 told
13   defendant that he (UCE5001) heard defendant needed some work done at
14   his restaurant.  Defendant affirmed the need for work and defendant
15   agreed to meeting with UCE5001 on October 3, 2017.

16        10.  October 3, 2017 Meeting Between Defendant and UCE5001
17             at Restaurant

18   On or about October 3, 2017, UCE5001 parked outside of
19   defendant's restaurant, Fat Boyz Grill, and called defendant on his
20   cellular telephone.  Defendant spoke with UCE5001 and defendant then
21   exited the restaurant to meet with UCE5001 inside UCE5001's vehicle.
22   While in UCE5001's vehicle, defendant agreed that he and UCE5001 did
23   not "need to do a lot of knowing each other," defendant explained
24   that the video surveillance cameras did not work, and that if the
25   waitress or anyone asked, UCE5001 was "a repair man looking at
26   stuff."  Defendant said he needed "it" done Saturday, and explained
27   that he would be heading out to Vegas when it happened.

28

1    Defendant and UCE5001 then exited UCE5001's vehicle and entered

2    Fat Boyz Grill.  Defendant explained that he had two out of five

3    units.  UCE5001 asked if defendant wanted to burn "this whole thing,

4    or you just want it localized[?]"  Defendant responded "the less it

5    looks like it's just me, that's fine," adding "so the three go, the

6    three go" referring to three of the units in the building, including

7    a suite that had been occupied by a Bail Bond Agency that was located

8    between the two units defendant utilized.

9    As the conversation continued, defendant explained that he

10   wanted the damage to be "total," and he explained that the landlord

11   would be turning off the water, and that the sprinklers would be down

12   over the weekend.  When UCE5001 asked if something should not burn

13   because it was not covered by defendant's insurance policy, defendant

14   replied that the policy covered everything.  In response to UCE5001's

15   questions, defendant confirmed that there had been a homeless person

16   in the space he utilized, and there had also been rodents, providing

17   potential false explanations for the origin of the planned arson.

18   Defendant said one of the suites housed a church, and another had

19   housed a bail bonds agency, but was now empty.  Defendant and UCE5001

20   also spoke about having a planned function for the restaurant

21   following the anticipated date of the arson, as well as the fact that

22   defendant had "updated" the appliances inside.

23   Defendant said that his insurance policy provided $300,000 in

24   coverage.  UCE5001 said the cost of the arson would be up to $1,500.

25   Defendant explained that the fire would have to burn quickly because

26   the fire department was just down the street from his restaurant and

27   the fire department would probably arrive within five minutes of the

28

fire starting.  Defendant added that he can leave a gas line open and
turn off the alarms, making it look like "staff" made a mistake.

11.  October 4, 2017 Conversation Between Defendant and CHS

The following day, defendant spoke with the CHS, and confirmed
the details for arson, explaining that the "electrician" was supposed
to do the job on Saturday, and that the fee was $1,500.

The CHS also told defendant that Steve would stop by the CHS's
shop on Friday (October 6), to drop off the rent money for
defendant's unit.  Defendant said he would go to the shop to meet
with Steve.

12.  October 5, 2017 Conversation Between Defendant and UC
Setting Up Next Meeting

On or about October 5, 2017, defendant and UCE5001 spoke by
telephone, using code to refer to a "site survey," and coordinating
for the next meeting the following day, October 6.

13.  October 6, 2017 Meeting Between Defendant and UCE5001
at Restaurant

On or about October 6, 2017, UCE5001 called defendant by
telephone and asked him to place a ladder or chair in the back alley
behind the restaurant.  UCE5001 explained that he wanted to check
something out, and then he would talk with defendant once he
finished.  UCE5001 arrived at the restaurant location in his vehicle.
He exited the vehicle and approached the back of the building, and as
he did so, he saw defendant place the ladder outside of the backdoor
to the building.  UCE5001 then took the ladder and inspected suite 3
and suite 1 of the building.

Afterwards, defendant met with UCE5001 in the UCE5001's vehicle
in front of the restaurant.  UCE5001 explained that he had a plan,

but UCE5001 needed more time to do the job and defendant responded by saying, "Shit, um I don't, I don't have no excuse to be gone next week."  Defendant then asked UCE5001 to do it "this weekend," explaining that defendant would be out of town, and that he already had a guy who was "pumping gas" in the restaurant.  UCE5001 asked for more time to do the job right, and defendant agreed, not wanting the fire to look "suspicious."  Defendant then provided UCE5001 with a black wristband with a small zipper, explaining "there's 15 right there."  In the wristband, there was $1,500 in cash.

        14.  <u>October 6, 2017 Meeting Between Defendant, the CHS,</u>
            <u>and Steve at the CHS's Shop in Adelanto</u>

On or about that same day, October 6, 2017, Steve, the CHS and defendant met at a shop owned by the CHS in Adelanto.  The specific location was outside of any zone approved for marijuana related activity by the City.  During that meeting the three discussed Steve's plan to operate a marijuana transportation business from a property owned by the defendant—which was also outside of any currently approved zone.  Defendant said Steve could operate the business so long as the business did not have any marijuana at the location.  However, defendant also said that he would take care of any problems with code enforcement in exchange for an additional payment each time.  Steve told defendant that Steve wanted to make sure that defendant would ensure that the votes would be in place for a future expansion of the marijuana business zone to include the location Steve was renting from the CHS, and defendant responded, "yes."  Steve then placed $10,000 on a box and said to defendant, "that's for you, or your non-profit."  Defendant took the money and confirmed that the cost for him to intervene with code enforcement

1  would be "a stack," or $2,000.  He added that code enforcement

2  "raids" once a month.

3      Defendant also told Steve that in order to get Steve's marijuana

4  transportation business up and running as soon as possible, Steve

5  should falsely claim in an application for a permit, that the

6  business would run out of the location where the three were meeting,

7  which was up to code, rather than the actual location that Steve had

8  agreed to rent from the CHS, which needed to be fixed before it could

9  pass an inspection for a permit.

10      15.  October 13, 2017 Conversation Between UC and Defendant
           in Which They Agree the Arson will Occur on Tuesday,
11         October 17, 2017

12      On October 13, 2017, UCE5001 called defendant by telephone,

13  confirmed that defendant was ready for the arson to go forward on

14  "Tuesday" (October 17), and asked what time defendant usually left

15  the restaurant on Tuesdays.  Defendant replied "seven."  UCE5001

16  confirmed that the arson would occur at night, to make sure that

17  defendant is not there, and that the defendant could put anything he

18  "want[s] gone" in the restaurant.  Defendant replied, "okay."

19      16.  October 17, 2017: Law Enforcement Confronts Defendant
           Concerning His Interactions with UCE5001
20

21      On October 17, 2017, defendant was approached by Federal Bureau

22  of Investigation agents, who spoke with defendant, and notified him

23  that they were aware of his interactions with UCE5001.  Federal

24  Bureau of Investigation agents showed defendant a picture of UCE5001.

25  Defendant said that he knew UCE5001 as an "electrician," and he

26  explained that he was supposed to do some work for defendant "today."

27  After initially claiming that UCE5001 was going to do some work on

28

the bathroom in the restaurant, defendant eventually admitted that UCE5001 would "take care of making sure that this place be gone."

17. **October 18, 2017: Defendant told the CHS that the FBI Knew About the Electrician and Enlisted the CHS's Help to "Get Shit Off [His] Door"**

The following day, on October 18, 2017, defendant approached the CHS and told the CHS that the FBI had searched Fat Boyz Grill and wanted defendant to cooperate with an on-going investigation. Defendant requested assistance from the CHS to make UCE5001 "go away," explaining that the FBI would not have a case against defendant without UCE5001.  (Not recorded.)  During that same meeting, defendant provided the CHS with a new "burner" cellular telephone number that defendant said he acquired after the FBI visited with him the day prior.

Later that same day, the CHS initiated a follow-up conversation with defendant, which was recorded.  During that conversation defendant told the CHS, "you brought shit to my door."  Defendant also said, "get shit off my door."  The CHS understood that defendant was telling the CHS to kill UCE5001.

18. **October 23-25, 2017: Defendant Spoke With the CHS About Hiring Someone to Assault Him so that He Could Feign Memory Loss**

On October 23 and 24, 2017, in recorded conversations, defendant spoke with the CHS about enlisting the CHS's assistance to have someone beat up defendant, thereby enabling defendant to claim he suffered memory loss.  Defendant explained to the CHS that it would allow him to get out of the situation he was in with the FBI.  On October 25, 2017, after defendant had agreed to assist the FBI in an ongoing investigation, and while in the presence of an FBI agent, defendant made a recorded telephone call to the CHS.  During that

13

call, the CHS told defendant that the CHS had arranged with someone to beat up defendant, as defendant requested.  Defendant tried multiple times to redirect the conversation and ultimately hung up on the CHS, saying "He's gonna go there.  Oh shit."  Still later that day, defendant met with the CHS in person, and in a recorded conversation, defendant told the CHS that he was okay with paying $600 for someone to knock him out, and he explained to the CHS that he did not want the CHS to discuss his request to be knocked out on the telephone call earlier because defendant was being followed by the FBI.

    19. <u>November 2-3, 2017: The CHS told Defendant that the Electrician Was Gone; the Next Day Defendant Reported that He was Assaulted</u>

  On November 2, 2017, in a recorded conversation, the CHS told defendant that the "electrician" was "gone."  Then the CHS began to say, "if they come asking any questions," but before the CHS could finish defendant said, "I don't know shit."  The following day, November 3, 2017, defendant reported to the police that he had been assaulted, although he had no visible injuries.

  **B.** **INFORMATION RELATING THE RESTAURANT'S USE IN INTERSTATE OR FOREIGN COMMERCE, OR ITS USE IN AN ACTIVITY AFFECTING INTERSTATE COMMERCE**

    1. <u>The Real Property was a Commercial Rental Property, Which Housed a Restaurant</u>

  As defendant stipulated, he rented Suite 1 of the building located at 11619 Rancho Road, in Adelanto, California, and that he operated his restaurant from that location.

2. **Fat Boyz Grill Utilized Products and Services From Many Out-of-State Businesses**

On October 17, 2017, Federal Bureau of Investigation agents visited Suites 1 and 3 of the building located at 11619 Rancho Road, in Adelanto, California, and took photographs of among other things, the products and equipment in the restaurant.  They also seized invoices.  The photographs and invoices show the presence of items in the restaurant, or commercial interactions with businesses, located out of the state of California.

3. **The Property Is Close to U.S. Route 395**

The building located at 11619 Rancho Road, in Adelanto, California is less than a half mile from United States Route 395.

4. **Wells Fargo Records Reflect Use of Wires Involving Restaurant and Payments to Interstate Vendors**

Defendant's Wells Fargo Account Statements show deposits from "Worldpay" referencing Fat Boyz Grill as well as transactions with businesses located in, or operating, outside of the State of California.

**V.   LEGAL AND EVIDENTIARY ISSUES**

**A.   INTERSTATE COMMERCE ELEMENT OF ARSON CHARGE**

1. **Rental Property and Restaurants Affect Interstate Commerce**

In an attempted arson of a building affecting interstate commerce case where the defense argued that a residential apartment building was not commercial or business property subject to 18 U.S.C. § 844(i), the Supreme Court disagreed, stating "the rental of real estate is unquestionably" an activity that affects commerce.  Russell v. United States, 471 U.S. 858, 862 (1985).  Similarly, the Ninth

15

Circuit has affirmed that a restaurant "is clearly commercial property," and as such it "*per se* substantially affected interstate commerce." United States v. Serang, 156 F.3d 910, 913-14 (9th Cir. 1998).

The building that defendant attempted to burn was a commercial rental property, and it also contained a restaurant. Accordingly, the real property was used in interstate or foreign commerce, and was used in an activity affecting interstate commerce.

**B.   SUBSTANTIAL STEP**

1.   Multiple Steps Taken By Defendant Were Substantial Steps

"[A]ttempt is a term that at common law requires proof that the defendant had the specific intent to commit the underlying crime and took some overt act that was a substantial step toward committing that crime." United States v. Gracidas-Ulibarry, 231 F.3d 1188, 1192 (9th Cir. 2000) (en banc). The substantial step must "strongly corroborate[]" defendant's intent to commit the underlying crime. United States v. Snell, 627 F.2d 186, 188-89 (9th Cir. 1980); United States v. Darby, 857 F.2d 623, 625 (9th Cir. 1988) (same). To be a substantial step, a defendant's "actions must cross the line between preparation and attempt by unequivocally demonstrating that the crime will take place unless interrupted by independent circumstances." United States v. Goetzke, 494 F.3d 1231, 1237 (9th Cir. 2007).

Here, defendant took multiple steps which constitute substantial steps, whether the steps are seen in isolation, or collectively. Defendant inquired with the CHS about finding someone to burn down his restaurant so he could collect insurance proceeds; defendant met with the UC, who defendant believed to be an arsonist, gave the

16

arsonist a tour of the suites that defendant wanted burned down, explained where things were located within the suites, and agreed on a price with the UC for the arson; the defendant met with the UC a second time at the suites, assisted the UC in surveying the suites a second time, and paid the UC $1,500 cash to burn down the restaurant; the defendant attempted to convince the UC to execute the arson sooner than the UC said that the UC was ready to do it, the defendant said that he had a guy pumping gas into the restaurant, and defendant planned the arson for when the water would be off in the building; and when the UC called defendant to confirm with the defendant that the UC would proceed with the arson on a specific date defendant agreed.  These steps go far beyond what Circuit Courts have upheld as sufficient steps to uphold an attempted violation of 18 U.S.C. § 844(i).  See, e.g., United States v. Bunney, 705 F.2d 378, 382 (10th Cir. 1983) (upholding two attempt counts where defendant had specific conversations with a second person concerning the destruction of the two buildings, defendant and the second person visited the two buildings, and defendant and the second person visited defendant's insurance agent to inquire about increased coverage while pretending that the second person was going to buy one of the locations); United States v. Brown, 604 F.2d 347, 350 (5th Cir. 1979), cert. denied, 455 U.S. 962 (1980) (upholding attempt conviction where defendant had five meetings and four telephone conversations with undercover agents, and the agents inspected the building in preparation for its destruction).

2.   Jurors Need Not Agree on What Act or Actions
     Constituted a Substantial Step

A unanimity instruction concerning what act or actions constitute a substantial step is not necessary.  The jury need not agree as to which particular act by the defendant constitutes a substantial step.  "Rather, the jury must unanimously agree that the substantial step requirement has been satisfied[.]"  United States v. Hofus, 598 F.3d 1171, 1176 (9th Cir. 2010).

C.   **RECORDINGS OF CONVERSATIONS**

At trial, the prosecution expects to introduce excerpts of audio and audio/video recordings of interactions between defendant and the UC or defendant and the CHS, including telephone calls.  All of these recordings have been produced to the defense and excerpts of these recordings have been placed onto compact discs, which plaintiff will offer as exhibits at trial.  The conversations captured by the recordings occurred in English.  The prosecution has had transcripts made for these recordings, which were previously provided to the defense.  The prosecution intends to use a computer program called Trial Director to play the recordings and display the transcripts, which are synched with the recordings.

For recorded conversations in the English language, the recording itself is the evidence, and a transcript of the recording may be provided as an aid in following the conversation.  United States v. Chen, 754 F.2d 817, 824 (9th Cir. 1985); United States v. Phillips, 577 F.2d 495, 501-02 (9th Cir. 1978).  All duly admitted recorded conversations must be played in open court.  The foundation that must be laid for the introduction into evidence of recorded conversations is a matter largely within the discretion of the trial

1    court. There is no rigid set of foundational requirements. Rather,

2    the Ninth Circuit has held that recordings are sufficiently

3    authenticated under Federal Rule of Evidence 901(a) if sufficient

4    proof has been introduced "so that a reasonable juror could find in

5    favor of authenticity or identification," which can be done by

6    "proving a connection between the evidence and the party against whom

7    the evidence is admitted" and can be done by both direct and

8    circumstantial evidence. United States v. Matta-Ballesteros, 71 F.3d

9    754, 768 (9th Cir. 1995), modified by 98 F.3d 1100 (9th Cir. 1996).

10    Witnesses may testify competently as to the identification of a

11    voice on a recording. A witness's opinion testimony in this regard

12    may be based upon his having heard the voice on another occasion

13    under circumstances connecting it with the alleged speaker. Fed. R.

14    Evid. 901(b)(5); United States v. Torres, 908 F.2d 1417, 1425 (9th

15    Cir. 1990) ("Testimony of voice recognition constitutes sufficient

16    authentication.").

17    Recorded conversations are competent evidence even when they are

18    partly inaudible, unless the unintelligible portions are so

19    substantial as to render the recording as a whole untrustworthy.

20    United States v. Rrapi, 175 F.3d 742, 746 (9th Cir. 1999).

21    The recordings contain out-of-court statements by defendant and

22    the CI or the CHS. Rule 801(c) of the Federal Rules of Evidence

23    defines "hearsay" as "a statement, other than one made by the

24    declarant while testifying at the trial or hearing, offered in

25    evidence to prove the truth of the matter asserted." Fed. R. Evid.

26    801(c). However, statements by a party opponent are admissible non-

27    hearsay, as are statements which are not being admitted for the truth

28    of the matter asserted but rather to show the effect on the person

1    who heard the statement.  Fed. R. Evid. 801(c), (d)(2)(A); see also

2    United States v. Valerio, 441 F.3d 837, 844 (9th Cir. 2006)

3    (informant's statements on a recording are admissible to give context

4    to defendant's statements).

5         Moreover, under the Federal Rules of Evidence, a defendant's

6    statement is admissible only if offered against him; a defendant may

7    not elicit his own prior statements.  Fed. R. Evid. 801(d)(2)(A);

8    United States v. Fernandez, 839 F.2d 639 (9th Cir. 1988).  When the

9    prosecution admits a portion of a defendant's prior statement, the

10   defendant may not put in additional out-of-court statements by him

11   because such statements are hearsay when offered by the defendant.

12   Fed. R. Evid. 801(d)(2); Fernandez, 839 F.2d at 640; United States v.

13   Ortega, 203 F.3d 675, 681-82 (9th Cir. 2000) (defendant prohibited

14   from eliciting his own exculpatory statements during cross

15   examination of government agent).

16        Further, it is entirely proper to admit segments of a statement

17   of a telephone call without including everything, and adverse parties

18   are not entitled to offer additional statements just because they are

19   there and the proponent has not offered them.  United States v.

20   Collicott, 92 F.3d 973, 983 (9th Cir. 1996).  The "rule of

21   completeness" set forth in Rule 106 of the Federal Rules of Evidence

22   is applicable where one party seeks to introduce a misleadingly

23   tailored snippet of a statement that creates a misleading impression

24   by being taken out of context.  Rule 106 does not render admissible

25   evidence which is otherwise inadmissible under the hearsay rules.

26   Id.  Accordingly, "non-self-inculpatory statements are inadmissible

27   even if they were made contemporaneously with other self-inculpatory

28   statements."  Ortega, 203 F.3d at 682 ("[S]elf-inculpatory

statements, when offered by the government, are admissions by a party-opponent and are therefore not hearsay, <u>see</u> Fed. R. Evid. 801(d)(2), but the non-self-inculpatory statements are inadmissible hearsay.").

Here, the prosecution has selected particular clips from recordings in an effort to streamline the trial, and the prosecution does not believe that the clips would leave a misleading impression as to the context of the statements recorded therein. While there are recorded non-self-inculpatory statements that defendant made during interviews with FBI agents or while discussing potential criminal exposure with the CHS, those statements are inadmissible hearsay and should not be admitted under Rule 106, or any other rule of evidence.

### D.   STILL IMAGES (PHOTOGRAPHS)

The prosecution intends to introduce still images (photographs) taken at and around Fat Boyz Restaurant.

Photographs are generally admissible as evidence. <u>See</u> <u>United States v. Stearns</u>, 550 F.2d 1167, 1171 (9th Cir. 1977) (photographs of crime scene admissible). Photographs should be admitted so long as they fairly and accurately represent the event or object in question. <u>United States v. Oaxaca</u>, 569 F.2d 518, 525 (9th Cir. 1978). "Photographs are admissible as substantive as well as illustrative evidence." <u>United States v. May</u>, 622 F.2d 1000, 1007 (9th Cir. 1980).

### E.   PHYSICAL EVIDENCE

The prosecution will seek to introduce limited physical evidence, namely the black wrist band and U.S. currency the UC

1   received from defendant on October 6, 2017, and invoices seized from

2   defendant's restaurant on October 17, 2017.

3       Rule 901(a) of the Federal Rules of Evidence provides that "the

4   requirement of authentication or identification as a condition

5   precedent to admissibility is satisfied by evidence sufficient to

6   support a finding that the matter in question is what its proponent

7   claims."  Rule 901(a) only requires the prosecution to make a *prima*

8   *facie* showing of authenticity or identification "so that a reasonable

9   [trier of fact] could find in favor of authenticity or

10  identification."  United States v. Chu Kong Yin, 935 F.2d 990, 996

11  (9th Cir. 1991); United States v. Blackwood, 878 F.2d 1200, 1202 (9th

12  Cir. 1989).  Once the government meets this burden, "the credibility

13  or probative force of the evidence offered is, ultimately, an issue

14  for the [factfinder]."  United States v. Black, 767 F.2d 1334, 1342

15  (9th Cir. 1985).

16      To be admitted into evidence, a physical exhibit must be in

17  substantially the same condition as when the crime was committed.

18  Fed. R. Evid. 901.  The Court may admit the evidence if there is a

19  "reasonable probability the article has not been changed in important

20  respects."  United States v. Harrington, 923 F.2d 1371, 1374 (9th

21  Cir. 1991).  This determination is to be made by the trial judge and

22  will not be overturned except for clear abuse of discretion.  Factors

23  the Court may consider in making this determination include the

24  nature of the item, the circumstances surrounding its preservation,

25  and the likelihood of intermeddlers having tampered with it.  Gallego

26  v. United States, 276 F.2d 914, 917 (9th Cir. 1960).

27      In establishing chain of custody as to an item of physical

28  evidence, the government is not required to call all persons who may

                                    22

1   have come into contact with the piece of evidence.  Harrington, 923

2   F.2d at 1374.  Moreover, a presumption of regularity exists in the

3   handling of exhibits by public officials.  Id.  Therefore, to the

4   extent that alleged or actual gaps in the chain of custody exist,

5   such gaps go to the weight of the evidence rather than to its

6   admissibility.  Id.

7       **F.   SELF-AUTHENTICATING RECORDS**

8       The prosecution intends to introduce Wells Fargo Bank records at

9   trial, namely, account statements, records of deposits and offsets,

10  and signature cards and an application.  These records were received

11  along with a Federal Rule of Evidence 902(11) declaration.

12      Federal Rule of Evidence 803(6) carves out an exception to the

13  hearsay rule for business records.  A document is admissible under

14  this rule if two foundational facts are established: (1) the document

15  was made or transmitted by a person with knowledge at or near the

16  time of the incident recorded, and (2) the document was kept in the

17  course of a regularly conducted business activity.  United States v.

18  Ray, 930 F.2d 1368, 1370 (9th Cir. 1990); Kennedy v. Los Angeles

19  Police Dep't, 901 F.2d 702, 717 (9th Cir. 1990), overruled on other

20  grounds by Hunter v. Bryant, 502 U.S. 224 (1991).  In determining if

21  these foundational facts have been established, the court may

22  consider hearsay and other evidence not admissible at trial.  See

23  Fed. R. Evid. 104(a), 1101(d)(1); Bourjaily v. United States, 483

24  U.S. 171, 178-79 (1987).

25      The foundation may be established either through a custodian of

26  records or "another qualified witness."  Fed. R. Evid. 803(6).  "The

27  phrase 'other qualified witness' is broadly interpreted to require

28  only that the witness understand the record keeping system."  United

1    States v. Childs, 5 F.3d 1328, 1334 (9th Cir. 1993); Ray, 930 F.2d at

2    1370.  The prosecution does not need to establish when and by whom

3    the document was prepared.  See Ray, 930 F.2d at 1370.

4         Challenges to the accuracy or completeness of the business

5    records ordinarily goes to the weight of the evidence and not its

6    admissibility.  See, e.g., La Porte v. United States, 300 F.2d 878,

7    880 (9th Cir. 1962).  Because Rule 803(6) represents a firmly rooted

8    hearsay exception, if non-testimonial evidence meets the requirements

9    for admission under the Rule, no further showing of reliability is

10   necessary for admission under the Confrontation Clause.  See Ohio v.

11   Roberts, 448 U.S. 56, 66 n.8 (1980), overruled on other grounds by

12   Crawford v. Washington, 541 U.S. 36 (2004); Ray, 930 F.2d at 1371;

13   United States v. Norton, 867 F.2d 1354, 1363 (11th Cir. 1989); United

14   States v. Baker, 855 F.2d 1353, 1360 (8th Cir. 1988).

15        Certified domestic records of regularly conducted activity are

16   self-authenticating when accompanied by a written declaration

17   establishing that (1) the records must have been made at or near the

18   time by, or from information transmitted by, a person with knowledge;

19   and (2) the records must have been made or kept in the course of a

20   regularly conducted business activity.  See Fed. R. Evid. 902(11).

21        Here, the declaration provided by Wells Fargo's employee Marlene

22   Rivera-Guthrie explains that the bank records complied with the

23   requirements of Fed. R. Evid. 902(11).

24        **G.   CROSS-EXAMINATION OF DEFENDANT**

25        If a defendant testifies at trial, he waives his right against

26   self-incrimination and subjects himself to cross-examination

27   concerning all matters reasonably related to the subject matter of

28   his testimony.  See, e.g., Fitzpatrick v. United States, 178 U.S. 304

1  (1971) ("The defendant cannot assert a self-incrimination privilege

2  'on matters reasonably related to the subject matter of his cross-

3  examination.'").  The scope of a defendant's waiver is co-extensive

4  with the scope of relevant cross-examination.  <u>United States v.</u>

5  <u>Cuozzo</u>, 962 F.2d 945, 948 (9th Cir. 1992); <u>Black</u>, 767 F.2d at 1341

6  (9th Cir. 1985) ("What the defendant actually discusses on direct

7  does not determine the extent of permissible cross-examination or his

8  waiver.  Rather, the inquiry is whether 'the government's questions

9  are reasonably related' to the subjects covered by the defendant's

10  testimony.").

11  **H.   RECIPROCAL DISCOVERY**

12  To date, defendant has not produced any reciprocal discovery to

13  the government apart from statements made by the defendant to

14  investigators on September 27, 2018, and December 6, 2018.

15  Accordingly, to the extent that defendant attempts to introduce or

16  use any documents (including photographs) or affirmative defense at

17  trial that he has not produced, and to which the prosecution is

18  entitled under Federal Rules of Criminal Procedure 12.1, 12.2, 16(b),

19  or 26.2, the prosecution reserves the right to object and to request

20  that the Court exclude the documents or the affirmative defense.  <u>See</u>

21  <u>United States v. Young</u>, 248 F.3d 260, 269-70 (4th Cir. 2001)

22  (upholding exclusion under Rule 16 of audiotape evidence defendant

23  did not produce in pretrial discovery where defendant sought to

24  introduce audiotape on cross-examination of government witness not

25  for impeachment purposes, but as substantive "evidence in chief" that

26  someone else committed the crime).

27

28