E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SEAN D. PETERSON (Cal. Bar No. 274263)
Assistant United States Attorney
Riverside Branch Office
    3403 10th Street, Suite 200
    Riverside, California 92501
    Telephone: (951) 276-6930
    Facsimile: (951) 276-6202
    E-mail:    sean.peterson2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>JERMAINE WRIGHT,<br><br>          Defendant. | ED CR No. 17-229-JGB<br><br>PLAINTIFF'S RESPONSE TO PRESENTENCE REPORT AND SENTENCING POSITION FOR DEFENDANT JERMAINE WRIGHT<br><br>Hearing Date: October 3, 2022<br>Hearing Time: 2:00 p.m.<br>Location:      Courtroom of the<br>                   Hon. Jesus G. Bernal |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Sean D. Peterson, hereby files its response to presentence report and sentencing position for defendant Jermaine Wright.

//

//

//

This filing is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: September 19, 2022          Respectfully submitted,

                                   E. MARTIN ESTRADA
                                   United States Attorney

                                   SCOTT M. GARRINGER
                                   Assistant United States Attorney
                                   Chief, Criminal Division


                                   _____/s/_____
                                   SEAN D. PETERSON
                                   Assistant United States Attorney

                                   Attorneys for Plaintiff
                                   UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES...............................3

I.    INTRODUCTION...................................................1

II.   STATEMENT OF FACTS............................................2

    A.   Investigation Initiated...................................2

    B.   June 15, 2017 Meeting Between Defendant, "Steve," and
       CHS.......................................................3

    C.   June 20, 2017 Conversation Between Defendant and Steve
       Concerning the Price for Defendant's Vote.................3

    D.   July 26, 2017 Meeting Between Defendant and Steve.........3

    E.   August 2017: Defendant Asked CHS to Find an Arsonist......4

    F.   August 31, 2017 Conversation Between Defendant and CHS
       Concerning Payment by a Dispensary Applicant and Steve....4

    G.   September 26, 2017 Conversation Between Defendant and
       CHS About Electrician and Steve's Lease...................5

    H.   September 28, 2017 Conversation Between Defendant and
       UCE5001, Acting as Arsonist...............................5

    I.   October 3, 2017 Meeting Between Defendant and UCE5001
       at Restaurant.............................................5

    J.   October 4, 2017 Conversation Between Defendant and CHS
       Concerning Defendant's Previous Meeting with UCE5001
       and a Plan to Meet Steve..................................7

    K.   October 5, 2017 Conversation Between Defendant and
       UCE5001 Setting Up Next Meeting...........................7

    L.   October 6, 2017 Meeting Between Defendant, the CHS,
       and Steve at the CHS's Shop in Adelanto..................7

    M.   October 6, 2017 Meeting Between Defendant and UCE5001
       at Restaurant; Defendant Pays UCE5001.....................8

    N.   October 13, 2017 Conversation Between UCE5001 and
       Defendant in Which They Agree the Arson will Occur on
       Tuesday, October 17, 2017.................................9

    O.   October 17, 2017: Law Enforcement Confronts Defendant
       Concerning His Interactions with UCE5001.................10

    P.   October 18, 2017: Defendant told the CHS that the FBI
       Knew About the Electrician and Enlisted the CHS's Help
       to "Get Shit Off [His] Door".............................10

Q.   October 23-25, 2017: Defendant Spoke With the CHS About Hiring Someone to Assault Him so that He Could Feign Memory Loss.........................................11

R.   November 2-3, 2017: The CHS told Defendant that the Electrician Was Gone; the Next Day Defendant Reported that He was Assaulted....................................12

III.  **THE SENTENCING GUIDELINES CALCULATION**.........................**13**

IV.  **ANALYSIS OF THE 18 U.S.C. § 3553(a) FACTORS**.................**14**

V.   **CONCLUSION**..............................................**17**

# TABLE OF AUTHORITIES

**STATUTES**

18 U.S.C. § 3553(a) ...............................................16

18 U.S.C. § 666(a)(1)(B) ...........................................3

18 U.S.C. § 844(i) .................................................3

**UNITED STATES SENTENCING GUIDELINES**

U.S.S.G. § 2B1.1(b)(1)(B) .........................................16

U.S.S.G. § 2C1.1 ..................................................16

U.S.S.G. § 2C1.1(b)(3) ............................................16

U.S.S.G. § 2K1.4(a)(1) ............................................15

U.S.S.G. § 3C1.1 ..................................................16

U.S.S.G. § 3D1.4 ..................................................16

U.S.S.G. § 5E1.2(c)(3) ............................................16

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3       Following a six-day trial, defendant, a former Adelanto City

4   Council Member and Mayor Pro Tem, as well as an owner/operator of a

5   Restaurant, Fat Boyz Grill, stands convicted of (i) bribery of

6   programs receiving federal funds, in violation of 18 U.S.C.

7   § 666(a)(1)(B), and (ii) attempted arson of a building affecting

8   interstate commerce, in violation of 18 U.S.C. §§ 844(i), 2(b).  The

9   latter conviction carries a five-year mandatory minimum sentence.  18

10  U.S.C. § 844(i).

11      The evidence submitted at trial showed that defendant betrayed

12  the trust placed in him as a public official by accepting a bribe

13  payment to expand a marijuana business zone and to intercede with

14  code enforcement.  It showed that he attempted to burn down his

15  restaurant by, among other things, hiring a person he thought was an

16  arsonist to burn down his restaurant, and paying the supposed

17  arsonist $1,500.  It also showed that defendant obstructed justice.

18  After the FBI approached defendant and told defendant that the FBI

19  knew about his attempted arson, and wanted his assistance in a

20  broader investigation into allegations of corruption in Adelanto,

21  defendant hatched two new schemes to avoid liability for his conduct.

22  In the first, defendant told a person working as a Confidential Human

23  Source for the FBI ("CHS") to make the supposed arsonist disappear.

24  In the second, defendant planned to hire someone to assault him so

25  that he would have a basis to claim a loss of memory, and fear of

26  reprisal for cooperating with law enforcement.  As part of his second

27  scheme, defendant ultimately convinced an unknowing third party to

28

destroy a law enforcement owned recording device that the FBI had
loaned to defendant.

Defendant's serious criminal conduct, his willingness to commit
other crimes, and his various attempts to obstruct justice, all
gravitate in favor of the imposition of a serious sentence in this
case.  This needs to be weighed against mitigating information in
defendant's PSR, such as his role as a foster parent.

Considering all of the aggravating and mitigating information
present, an appropriate sentence in this case is a 79-month term of
imprisonment, a fine of $25,000, a special assessment of $200, and
the imposition of a 3-year term of supervised release.

## II.   STATEMENT OF FACTS[1]

### A.   Investigation Initiated

In early 2017, the FBI opened an investigation into allegations
of public corruption in the City of Adelanto, California, involving
defendant, then a City Council Member and also Mayor Pro Tem of the
City of Adelanto.  At that time, defendant operated a restaurant
known as Fat Boyz Grill, located in Suite 1 of a building located at
11619 Rancho Road, in Adelanto, California (where defendant also had
access to Suite 3).  During the investigation, the FBI identified a
witness who already worked in Adelanto and who was familiar with
defendant, among other people involved in City government.  That
witness agreed to assist the FBI in its investigation, and the FBI
designated that person as a CHS.

---

[1] The Facts referenced here are based on the trial testimony and
exhibits that were accepted into evidence, as well as the factual
recitation of the PSR at PSR ¶¶ 6-31.

**B.   June 15, 2017 Meeting Between Defendant, "Steve," and CHS**

On or about June 15, 2017, the CHS introduced an undercover FBI employee (UCE5360) who went by the name of "Steve" to defendant at defendant's restaurant, Fat Boyz Grill, in Adelanto, California. Among other things, during that meeting Steve told defendant that Steve was interested in moving his marijuana cultivation business to Adelanto.  Steve also asked about the best way to get permits, licenses, and other approvals necessary for operation, and told defendant that he was interested in purchasing a commercial property outside of the approved zone for marijuana cultivation at a reduced price, and then attempting to have the land re-zoned by the City Council.

**C.   June 20, 2017 Conversation Between Defendant and Steve Concerning the Price for Defendant's Vote**

On or about June 20, 2017, Steve placed a recorded telephone call to defendant.  During that call Steve and defendant returned to part of their discussion from the previous meeting, specifically, the price for each City Council Member to vote to extend the zone for cultivating marijuana.  Steve confirmed with defendant the price that defendant had mentioned for each vote, including the price for defendant's vote ("20," meaning $20,000).

**D.   July 26, 2017 Meeting Between Defendant and Steve**

On or about July 26, 2017, Steve met with defendant at Fat Boyz Grill, where they had a recorded conversation.  A couple of weeks before that meeting, the City Council had voted to expand the cultivation zone for marijuana, but Steve had not yet bought or leased a location within the newly rezoned area prior to the vote by the City Council.  Defendant told Steve that defendant tried to warn

3

Steve before the vote, but Steve did not receive any message from defendant.  During this meeting, defendant told Steve to obtain a location within the expanded cultivation zone, and defendant said that he would assist Steve with "pushing" (that is, facilitating procuration of) permits.  Defendant spoke about a "donation" by Steve of $15,000 as part of the package for pushing the permits.

**E.   August 2017: Defendant Asked CHS to Find an Arsonist**

In August 2017, the CHS had a conversation with defendant in which defendant requested, among other things, assistance finding someone who can help burn down defendant's business, Fat Boyz Grill, so that defendant could collect the insurance money.

**F.   August 31, 2017 Conversation Between Defendant and CHS Concerning Payment by a Dispensary Applicant and Steve**

On or about August 31, 2017, in a recorded conversation, defendant explained to the CHS that defendant was in contact with a marijuana business that would pay defendant and the CHS a total of $20,000, for engineering a vote to select that business as one of four to receive a marijuana dispensary permit in the City of Adelanto.  Defendant explained how the $20,000 needed to go to a non-profit that defendant established to conceal what he and the CHS were doing, and defendant said that he would put the CHS on the board of defendant's non-profit so that the CHS could receive money as well. During that conversation the CHS told defendant that Steve wanted to rent a corner lot that the CHS owned in Adelanto to operate a marijuana transportation company.  Defendant told the CHS that Steve would need an exemption, and that defendant wanted "ten," meaning $10,000, for Steve to receive his exemption.

**G.   September 26, 2017 Conversation Between Defendant and CHS About Electrician and Steve's Lease**

On or about September 26, 2017, in a recorded conversation, defendant gave permission for the CHS to pass defendant's cellular telephone number to the "electrician," i.e., the arsonist whom defendant had previously discussed with the CHS.

During that September 26 conversation, the CHS told defendant that Steve had signed a lease to rent a property from the CHS and operate a marijuana transportation business outside of the approved zone.  Defendant said the business could not operate out of the zone, and said he would talk to a third party about using that third party's address, which was in the zone.

**H.   September 28, 2017 Conversation Between Defendant and UCE5001, Acting as Arsonist**

On or about September 28, 2017, an FBI employee acting in an undercover capacity as a would-be arsonist, or UCE5001 as the employee was designated for purposes of the investigation, placed a recorded telephone call to defendant's telephone number.  UCE5001 did not identify himself, but UCE5001 told defendant that he (UCE5001) had heard defendant needed some work done at his restaurant. Defendant affirmed the need for work and defendant agreed to meeting with UCE5001 on October 3, 2017.

**I.   October 3, 2017 Meeting Between Defendant and UCE5001 at Restaurant**

On or about October 3, 2017, UCE5001 parked outside of defendant's restaurant, Fat Boyz Grill, and called defendant on his cellular telephone.  Defendant spoke with UCE5001 and defendant then exited the restaurant to meet with UCE5001 inside UCE5001's vehicle.

While in UCE5001's vehicle, defendant agreed that he and UCE5001 did not "need to do a lot of knowing each other," defendant explained that the video surveillance cameras at the restaurant did not work, and that if the waitress or anyone asked, UCE5001 was "a repair man looking at stuff." Defendant said he needed "it" done Saturday, and explained that he would be heading out to Las Vegas when it happened.

Defendant and UCE5001 then exited UCE5001's vehicle and entered Fat Boyz Grill. Defendant explained that he had two out of five units in the building. UCE5001 asked if defendant wanted to burn "this whole thing, or you just want it localized[?]" Defendant responded "the less it looks like it's just me, that's fine," adding "so the three go, the three go," referring to three of the units in the building, including a suite that had been occupied by a Bail Bond Agency, that was located between the two units defendant utilized.

As the conversation continued, defendant explained that he wanted the damage to be "total," and he explained that the landlord would be turning off the water, and that the sprinklers would be down over the weekend. When UCE5001 asked if something should not burn because it was not covered by defendant's insurance policy, defendant replied that the policy covered everything. In response to UCE5001's questions, defendant confirmed that there had been a homeless person in the space he utilized, and there had also been rodents, providing potential false explanations for the cause of the planned arson. Defendant said one of the suites housed a church, and another had housed a bail bonds agency, but the unit with the bail bonds agency was now empty. Defendant and UCE5001 also spoke about having a planned event for the restaurant following the anticipated date of the arson, as well as the fact that defendant had "updated" the

appliances inside, to deflect suspicion concerning whether the fire was purposely set.

Defendant said that his insurance policy provided $300,000 in coverage.  UCE5001 said the cost of the arson would be up to $1,500. Defendant explained that the fire would have to burn quickly because the fire department was just down the street from his restaurant and the fire department would probably arrive within five minutes of the fire starting.  Defendant added that he can leave a gas line open and turn off the alarms, making it look like "staff" made a mistake.

**J.   October 4, 2017 Conversation Between Defendant and CHS Concerning Defendant's Previous Meeting with UCE5001 and a Plan to Meet Steve**

The following day, on or about October 4, 2017, defendant spoke with the CHS, and confirmed the details for arson, explaining that the "electrician" was supposed to do the job on Saturday, and that the fee was $1,500.

The CHS also told defendant that Steve would stop by the CHS's shop on Friday (October 6), to drop off the rent money for defendant's unit.  Defendant said he would go to the shop to meet with Steve.

**K.   October 5, 2017 Conversation Between Defendant and UCE5001 Setting Up Next Meeting**

On or about October 5, 2017, defendant and UCE5001 spoke by telephone, using code words to refer to a "site survey," and coordinating for the next meeting the following day, October 6.

**L.   October 6, 2017 Meeting Between Defendant, the CHS, and Steve at the CHS's Shop in Adelanto**

On or about October 6, 2017, Steve, the CHS and defendant met at a shop owned by the CHS in Adelanto.  During that meeting the three

discussed Steve's plan to operate a marijuana transportation business from a property owned by the defendant—which was also outside of any currently approved zone.  Defendant said Steve could operate the business so long as the business did not have any marijuana at the location.  However, defendant also said that he would take care of any problems with code enforcement in exchange for an additional payment each time.  Steve told defendant that Steve wanted to make sure that defendant would ensure that the votes would be in place for a future expansion of the marijuana business zone to include the location Steve was renting from the CHS, and defendant responded, "yes."  Steve then placed $10,000 on a box and said to defendant, "that's for you, or your non-profit."  Steve again confirmed that the payment was for votes and for protection from code enforcement.  Defendant took the money and confirmed that the cost for him to intervene with code enforcement would be "a stack," or $2,000.  He added that code enforcement "raids" once a month.

Defendant also told Steve that in order to get Steve's marijuana transportation business up and running as soon as possible, Steve should falsely claim in an application for a permit that the business would run out of the location where the three were meeting, which was up to code, rather than the actual location that Steve had agreed to rent from the CHS, which needed to be fixed before it could pass an inspection for a permit.

**M.   October 6, 2017 Meeting Between Defendant and UCE5001 at Restaurant; Defendant Pays UCE5001**

Also that day, on or about October 6, 2017, UCE5001 called defendant by telephone and asked him to place a ladder or chair in the back alley behind the restaurant.  UCE5001 explained that he

wanted to check something out, and then he would talk with defendant once he finished.  UCE5001 arrived at the restaurant location in his vehicle.  He exited the vehicle and approached the back of the building, and as he did so, he saw defendant place the ladder outside of the backdoor to the building.  UCE5001 then took the ladder and inspected suite 3 and suite 1 of the building.

Afterwards, defendant met with UCE5001 in UCE5001's vehicle in front of the restaurant.  UCE5001 explained that he had a plan, but UCE5001 needed more time to do the job and defendant responded by saying, "Shit, um I don't, I don't have no excuse to be gone next week."  Defendant then asked UCE5001 to do it "this weekend," explaining that defendant would be out of town, and that he already had a guy who was "pumping gas" in the restaurant.  UCE5001 asked for more time to do the job right, and defendant agreed, not wanting the fire to look "suspicious."  Defendant then provided UCE5001 with a black wristband with a small zipper, explaining "there's 15 right there."  In the wristband, there was $1,500 in cash.

**N.   October 13, 2017 Conversation Between UCE5001 and Defendant in Which They Agree the Arson will Occur on Tuesday, October 17, 2017**

On or about October 13, 2017, UCE5001 called defendant by telephone, confirmed that defendant was ready for the arson to go forward on "Tuesday" (October 17), and asked what time defendant usually left the restaurant on Tuesdays.  Defendant replied "seven."  UCE5001 confirmed that the arson would occur at night, to make sure that defendant is not there, and that defendant could put anything he "want[s] gone" in the restaurant.  Defendant replied, "okay."

**O.    October 17, 2017: Law Enforcement Confronts Defendant Concerning His Interactions with UCE5001**

On or about October 17, 2017, defendant was approached by FBI agents, who spoke with defendant, and told him that they were aware of his interactions with UCE5001.  FBI agents showed defendant a picture of UCE5001.  Defendant said that he knew UCE5001 as an "electrician," and he explained that he was supposed to do some work for defendant "today."  After initially claiming that UCE5001 was going to do some work on the bathroom in the restaurant, defendant eventually admitted that UCE5001 would "take care of making sure that this place be gone."

FBI Special Agent Kevin Boles testified during defendant's trial that he asked defendant to act as a confidential source for the FBI in its investigation into allegations of corruption among elected officials in Adelanto.  Defendant agreed to do so.

**P.    October 18, 2017: Defendant told the CHS that the FBI Knew About the Electrician and Enlisted the CHS's Help to "Get Shit Off [His] Door"**

The following day, on or about October 18, 2017, however, defendant approached the CHS and told the CHS that the FBI had searched Fat Boyz Grill and wanted defendant to cooperate with an ongoing investigation.  Defendant requested assistance from the CHS to make UCE5001 "go away," explaining that the FBI would not have a case against defendant without UCE5001.

Later that same day, the CHS initiated a follow-up conversation with defendant, which was recorded.  During that conversation defendant told the CHS, "you brought shit to my door."  Defendant also said, "get shit off my door."  The CHS understood that defendant was telling the CHS to kill UCE5001.

**Q. October 23-25, 2017: Defendant Spoke With the CHS About Hiring Someone to Assault Him so that He Could Feign Memory Loss**

On or about October 23, 2017, in recorded conversations, defendant spoke with the CHS about enlisting the CHS's assistance to have someone beat up defendant, thereby enabling defendant to claim he suffered memory loss.  Defendant explained to the CHS that it would allow him to get out of the situation he was in with the FBI if defendant were assaulted and could claim memory loss.  At trial, the CHS testified, and recordings corroborated, that defendant said the assault needed to happen early in the morning outside of his restaurant, and he suggested that a rat could be placed next to him, implying that the motive for someone else to assault him was as a form of punishment for acting as an informant for the FBI.

On or about October 25, 2017, after defendant had agreed to assist the FBI in an ongoing investigation, and while in the presence of an FBI agent, defendant made a recorded telephone call to the CHS. During that call, the CHS told defendant that the CHS had arranged with someone to beat up defendant, as defendant had requested. Defendant tried multiple times to redirect the conversation and ultimately hung up on the CHS, saying "He's gonna go there.  Oh shit."  Still later that day, defendant met with the CHS in person, and in a recorded conversation, defendant told the CHS that he was okay with paying $600 for someone to knock him out, and he explained to the CHS that he did not want the CHS to discuss his request to be knocked out on the telephone call earlier because defendant was being followed by the FBI.

**R.    November 2-3, 2017: The CHS told Defendant that the Electrician Was Gone; the Next Day Defendant Reported that He was Assaulted**

On or about November 2, 2017, in a recorded conversation, the CHS told defendant that the "electrician" was "gone."  Then the CHS began to say, "if they come asking any questions," but before the CHS could finish defendant said, "I don't know shit."

The following day, November 3, 2017, defendant reported to the police that he had been assaulted.

During the trial, San Bernardino County Sheriff's Department Detective Travis James testified that he reported to Fat Boyz Grill Restaurant on the morning of November 3, 2017, where he saw defendant in the company of Fire Department personnel and ambulance personnel. He saw defendant speak with the Fire Department and ambulance personnel, and saw that he did not want to be brought to the hospital by emergency personnel.  However, when Mr. James attempted to talk with defendant, defendant looked away from him and barely spoke to him, presenting himself as unfocused or unable to communicate, so Mr. James asked the fire department and ambulance personnel to return and speak with defendant again.  Mr. James testified that defendant did not act like other victims of assault that Mr. James had interacted with in the past.

A lay witness, Lavalle Garrett, testified that he saw defendant on the morning of November 3, and that defendant acted differently than he usually did, and Mr. Garrett told defendant to go to the hospital.  Mr. Garrett said that defendant told Mr. Garrett that defendant had been assaulted and that a rat had been placed next to him.  Defendant also asked Mr. Garrett to destroy an electronic device, which Mr. Garrett did at defendant's request.  Special Agent

12

Boles testified that later that day he received a destroyed recording device, which he had previously loaned to defendant for defendant to use in his efforts to assist the FBI in a broader corruption investigation.

## III. THE SENTENCING GUIDELINES CALCULATION

Plaintiff agrees with the Probation Officer's Guideline calculation in the PSR.  The United States Probation Office ("USPO") determined that defendant has a total offense level of twenty-seven, after applying a grouping analysis to the two counts of conviction. The USPO determined that defendant's conviction for the attempted arson of a building affecting interstate commerce carries a base offense level of twenty four, pursuant to U.S.S.G. § 2K1.4(a)(1), an increase in two levels for obstruction of justice, pursuant to U.S.S.G. § 3C1.1, and an increase in one level for not grouping with the other count of conviction, which had an adjusted offense level within six points of the attempted arson of a building affecting interstate commerce count.  See U.S.S.G. § 3D1.4.

The USPO determined that defendant has a total offense level of twenty for bribery of programs receiving federal funds, determined by a base offense level of fourteen, pursuant to U.S.S.G. § 2C1.1, adjusted upwards by two levels, because the $10,000 bribe payment exceeded the $6,500 threshold pursuant to U.S.S.G. § 2B1.1(b)(1)(B), adjusted upwards by an additional four levels because defendant was an elected public official (and a public official in a high level decision-making or sensitive position) pursuant to U.S.S.G. § 2C1.1(b)(3).  The United States agrees with the total offense level calculated by the USPO.

The USPO also determined that defendant has zero criminal history points, placing him in Criminal History Category I.  (PSR ¶¶ 63-67.)  The United States agrees with the USPO's Criminal History Category computation.  The United States also agrees with the fine range calculation of $25,000 to $250,000.  See U.S.S.G. § 5E1.2(c)(3); see also PSR ¶ 123.

With a Criminal History Category of I and a total offense level of 27, defendant's Guidelines sentencing range is 70-87 months' imprisonment.

**IV.   ANALYSIS OF THE 18 U.S.C. § 3553(a) FACTORS**

A mid-term Guidelines sentence of 79 months' imprisonment is reasonable in light of the factors listed under 18 U.S.C. § 3553(a). Such a sentence would reflect the nature and circumstances of the offenses and the history and characteristics of defendant, among other relevant sentencing factors.

Defendant was a City Council Member and Mayor Pro Tem for the City of Adelanto.  He abused his position of trust as an elected official to line his own pockets.  Unfortunately, his decision to accept a $10,000 bribe payment was not a one-off event.  The recordings in this case show that he spoke to the undercover agent and CHS over a period of months.  Defendant initially quoted a price of $20,000 for his vote on a City Council matter.  Later, he suggested $15,000 for "pushing" permits.  Finally, he accepted a $10,000 payment, and he said that he expected "a stack," or $2,000, each time he would interfere with code enforcement going forward. While the investigation was pending, defendant also explained to the CHS that defendant had found an applicant for a marijuana dispensary

14

permit who would pay defendant (and the CHS) $20,000 to ensure that the applicant received the dispensary permit.

At the same time that defendant was seeking out bribe payments in exchange for his vote or his influence as an elected official, he also decided to pursue a scheme to burn down his restaurant to collect insurance money.  Defendant sought out an arsonist.  He took the arsonist (in reality, UCE5001) on a tour of the restaurant and an adjoining suite, so that the arsonist could construct a plan to burn down the restaurant and the adjoining suite.  Defendant discussed with the arsonist how to make the fire look like an accident, and defendant discussed with the arsonist how defendant could contribute to the fire by leaving the gas on or planning the arson for when the water would be shut off.  Defendant knew the Fire Department was down the street, and he emphasized that the fire would have to burn quickly.  Defendant also knew that there was another entity, a church, that used the same building he did, but located in a different suite.  The fire would potentially put others at risk. Ultimately, defendant paid the arsonist $1,500 to burn down the two suites (including the restaurant).  Defendant put the wheels in motion for the arson to occur, and it only did not occur because the arsonist he paid was actually an undercover law enforcement agent.

Once defendant found out that law enforcement knew that he hired someone to burn down his restaurant, he did not stop scheming.  The FBI told defendant that the FBI wanted his help to investigate allegations of corruption in Adelanto.  Rather than attempting to ameliorate the harm he had caused by actually assisting the FBI in its investigation, defendant attempted to undermine the investigation into his own bad conduct.  Immediately after being approached by the

15

FBI, defendant told the CHS that the CHS—who had introduced the arsonist to defendant at defendant's request—had brought "shit to defendant's door" and he told the CHS "get shit off my door."  The CHS understood that to be an instruction to kill the arsonist.

Defendant also pursued a different scheme.  He told the CHS that he wanted someone, initially the CHS and later someone the CHS would hire on behalf of defendant, to assault defendant outside of his restaurant and to leave a rat next to him.  Defendant explained that he would be able to claim falsely a loss of memory and also, apparently, he would claim that someone had punished him for cooperating with law enforcement in an investigation.  Although the CHS did not ultimately arrange for anyone to assault defendant, defendant went ahead and did it himself, or at least he later claimed that he was assaulted outside of his restaurant, and that a rat had been placed next to him, just as he had requested be done in his recorded conversation with the CHS.  Following the alleged assault, defendant acted unfocused and forgetful when speaking with law enforcement who interacted with him, but he did not act that way in speaking with the CHS (outside of the presence of law enforcement officers).  Moreover, the morning of the alleged assault, defendant convinced a witness who stopped by his restaurant to destroy a recording device that had been loaned to defendant by the FBI for use in the broader corruption investigation.

Defendant's persistent and varied attempts to obstruct the investigation into his own misconduct, and to frustrate the efforts of the FBI to investigate other allegations of public corruption, are additional forms of serious misconduct, beyond the convictions at issue in this case.

In evaluating an appropriate sentence in this case, it is also appropriate for the court to consider ameliorating factors in defendant's history and characteristics, such as his contributions to the community as a foster parent, and the possibility that he may have been suffering emotionally when he engaged in some of the conduct at issue in this case because of tension with his then-wife.

In sum, after evaluating all of the 3553(a) factors, the Court should sentence defendant to a mid-Guidelines term of 79 months' imprisonment, a $25,000 fine, a $200 special assessment, and a three-year term of supervised release.

**V.  CONCLUSION**

For the foregoing reasons, the government respectfully requests that this Court impose a sentence of 79 months' imprisonment, a $25,000 fine, a $200 special assessment, and a three-year term of supervised release.